**BUSINESS MEN'S ASSURANCE COMPANY OF AMERICA,**
Respondent,

v.

**Bruce GRAHAM, as Representative of the Current Partners of Skidmore, Owings, & Merrill, et al., Appellants.**

No. 81240.

Supreme Court of Missouri,
En Banc.

Feb. 9, 1999.

Lawrence M. Berkowitz, James R. Ward, Berkowitz, Feldmiller, et al., Kansas City, for appellants.

Roy C. Bush, William E. Quirk, Richard M. Paul, III, Shughart, Thompson & Kilroy, P.C., Kansas City, for respondent.

PER CURIAM.[1]

Bruce Graham, as representative of the current partners of Skidmore, Owings & Merrill ("Skidmore"), appeals the circuit court's judgment in favor of Business Men's Assurance Company of America ("BMA") on the issue of whether BMA's claim against Skidmore was barred by the applicable statute of limitations. In *Business Men's Assur. Co. v. Graham,* 891 S.W.2d 438 (Mo.App. 1994) ("*BMA I* "), the court of appeals reviewed the judgment entered for BMA after a jury trial in this same cause. One of the issues on appeal was whether the statute of limitations issue should have been submitted to a jury. The court of appeals held that the trial court erred in failing to submit the issue to the jury and remanded for a new trial on that issue. In the interest of judicial economy, the court of appeals resolved the other issues on appeal. Consequently, the only issue on remand was the issue of whether the claims were barred by the statute of limitations. *Id.* at 457.

On remand, Skidmore elected to waive trial by jury and submit the issue to the court. The trial court (with a different judge) found that BMA's claim was not barred by the applicable statute of limitations. Skidmore contends that the trial court erred by so holding because it declared and applied the wrong legal standards. Skidmore also claims that the trial court's findings were clearly erroneous and against the weight of the evidence. Finally, Skidmore urges the Court to review the case de novo and reverse the trial court's judgment. The judgment is affirmed.

### *Background*

In 1960, BMA contracted with Skidmore, as architects and engineers, to design the BMA office tower. Part of the building design included an exterior thin marble cladding system. In its contract with BMA, Skidmore agreed that:

[W]e will furnish assistance in taking of bids, selection of contractor(s), and the development of construction contract(s), checking of contractors' and manufacturers' shop drawings, approval of material samples, issuance of certificates of payment and full-time supervision of work by an architectural superintendent on the site who shall be responsible for the coordination, performance and completion of all architectural, structural, civil, mechanical, and electrical engineering work in accordance with the approved drawings and specifications. It is understood, that, although in supervision of construction we will use our best efforts to protect you against defects and deficiencies in the work of contractors, we will not guarantee performance by them of their contracts.

The general contractor, Winn–Senter Construction Company, started work on the building in 1961 and completed construction in 1963. Carthage Marble Company subcontracted to furnish and install the marble on

---

1. The appeal in this case was originally decided by the Court of Appeals, Western District, in an opinion written by the Honorable James M. Smart, Jr. Following transfer to this Court, the court of appeals opinion, as modified, is adopted as the opinion of this Court.

the BMA tower. Approximately four thousand four hundred white marble panels were installed on the exterior of the building. The one and one-fourth inch panels covered all four sides of the building. The building was designed with vertical columns and horizontal cross pieces, called spandrels, connecting the columns on each floor. Individual marble panels were installed on the outside of the spandrels and anchored to the frame of the building. The anchors could not be seen on the outside panels of marble.

In April 1985, one column panel fell from the penthouse to the roof of the BMA tower. One month later, two horizontal panels fell from the seventh floor of the west elevation to the ground. BMA filed suit against Skidmore in August 1986 for negligence and breach of contract. Skidmore filed a motion for summary judgment claiming that the applicable statute of limitations, section 516.120, RSMo 1986, required BMA to file its action within five years of the time that the damage resulting from Skidmore's breach was sustained or was capable of ascertainment. Skidmore contended that BMA's damages were sustained and capable of ascertainment before August 12, 1981; thus, BMA's claims were time-barred.

The trial court ruled on the statute of limitations issue. It found that BMA's claims were not time-barred. BMA's claims of negligence and breach of contract against Skidmore were then heard and decided by a jury. The jury returned a verdict in favor of BMA. After the trial court adjusted the verdict to reflect BMA's settlements with Winn–Senter Construction Company and Carthage Marble Company, BMA was awarded judgment in the amount of $5,287,991.87. Skidmore appealed.

In *BMA I*, the court of appeals reversed the judgment and remanded for retrial on the issue of the statute of limitations, holding that the trial court erred by not submitting the issue to a jury because there were disputed factual issues in the case. *BMA I*, 891 S.W.2d at 447. In the course of its discussion on the statute of limitations issue, the court held that Skidmore did not establish, as a matter of law, that BMA's damages were ascertainable prior to August 12, 1981. *Id.* at 446.

On remand, the parties waived a jury and agreed to submit the issue to the trial judge. A bench trial was conducted beginning on July 1, 1996. The parties agreed that the trial judge could consider the evidence presented at the first trial through the transcript. In addition, new testimony was offered by both sides, through the use of live witnesses and depositions. Once again, the parties presented conflicting evidence on the question of when the damage could have been ascertained by BMA.

### The Testimony

The deposition of Robert Hicklin was read into the record. It established that Mr. Hicklin was a maintenance carpenter who assisted in maintaining the exterior of the BMA building from 1966 through 1983. Mr. Hicklin worked for Winn–Senter during the construction of the BMA Tower, although he did not work on the marble installation. He left Winn–Senter in 1966 to work for Penn Valley Maintenance, the company providing maintenance services for BMA. Mr. Hicklin reported exclusively to Mark Crew, the building manager, and a BMA employee. Mr. Hicklin testified that every winter, small pieces of marble would fall from the building. The broken chips were from the column marble pieces, not from the horizontal marble pieces. Although some of the pieces were reattached by Carthage Marble, Mr. Hicklin reattached the chips with Dow Corning 780. Mr. Hicklin could not determine whether any of the panels were warped, nor did he see any moon-shaped cracks near the anchor locations. He detected no movement in the panels. Mr. Hicklin saw only one crack in the marble panels. He stated that the panel had been defective from the beginning. Carthage Marble replaced the damaged panel. Mr. Hicklin believed that water freezing behind the panels was responsible for the protrusions in the marble because he did not see any other cause for such an occurrence.

Deposition testimony given by Clay Hubbard, a mechanical engineer who worked at BMA from 1963 through 1970, was also read into the record. Mr. Hubbard testified that

he talked to Skidmore concerning a problem with moisture behind the panels. Moist air was able to get behind the panels. When it was cold, the water condensed and froze behind the panels. The caulking on some of the panels came loose. There was no discernable pattern as to the panels having loose caulking. As a result of meeting with Skidmore, Mr. Hicklin was directed to install a sheet rock wall to prevent the cold air from entering the building. Mr. Hubbard saw no displacement of the marble panels on the columns. He did not see any cracks in the marble panels. Mr. Hubbard was of the opinion that the moisture behind the panels was the cause of the problems.

BMA presented live testimony from Mark Crew, the BMA employee charged with responsibility for the maintenance of the exterior of the BMA tower. Mr. Crew's testimony conflicted in some respects with the testimony of Mr. Hicklin. Mark Crew testified that his responsibilities at BMA included any problems or concerns with the marble facade. The only problem with the marble chipping that Mr. Crew knew about was chipping where the aluminum cap touched the column. Sometime in the mid–1960s Skidmore was contacted about the problem, and it was suggested that expansion joints be cut in the aluminum caps. This work was done. Mr. Crew did not observe any further problems. Mr. Crew testified he had no reason to believe that there was anything defective about the design of the marble cladding system, nor were any defects in the system brought to his attention. He further testified that he had not noticed any cracks in the marble around the anchor. Mr. Crew denied being told by Mr. Hicklin about problems with the marble or that Mr. Hicklin suggested that six slabs of marble be purchased for replacement purposes. He denied knowledge of Mr. Hicklin's repairs to the cracks in the marble or that he was ever told that the marble was loose. He consulted with Skidmore frequently. At no time did Skidmore indicate that there was a problem with the marble.

Richard E. Lenke, a Skidmore partner, visited the BMA tower in June 1985 to determine why the panels had fallen off the building and to assess the possibility of other failures. Mr. Lenke was not able to form an opinion concerning the failure of the panels. He thought that the building as a whole looked very good for a 25–year–old building, and that it was "a very respectable looking building." At his deposition, taken in the fall of 1990, Mr. Lenke said he had still not reached a definite conclusion. Mr. Lenke determined from the survey taken by Black & Veatch that about three or three and one-half percent of the total panels were defective. He identified eighteen panels with potential failure problems. Mr. Lenke could not determine the cause of the damage. In his initial deposition, he opined that the damage could have been caused by the wind, or by defective maintenance, or by defective installation.

BMA engaged Black & Veatch to investigate. Black & Veatch reported the following findings:

(a) Strength of the original marble.

There apparently was no quality control of the strength of the marble panels originally installed on the building. The quarry tests that we received from The Georgia Marble Co. were reportedly made as a requirement for a previous building as none were required for this project. It is obvious from the testing that we have reported ... that a wide variation of panel strength existed in the quarry. A quality control program should have been used.

(b) Thickness.

The marble is 1–1/4" thick which is considered thin for panels of this size. The thinness has contributed to the warping and to the lack of adequate material for making attachments.

(c) Warping.

The warping of the panels is causing the side attachments to fracture the marble and fail, and is moving the marble off of the vertical support angles.

(d) Method of attachments.

Approximately 50 percent of the attachments for the columns are blind. These are the twisted wires attached to the back of the panels and shoved into dove-tail anchors filled with mortar. There is no way to be sure that the twisted wires are

properly embedded in the mortar. The attachment of the wires themselves to the back side of the marble is also suspect because no dimensions were provided. The panel that fell to the roof failed in the attachment of the wire to the back face of the marble.

(e) Loss of strength by aging.

The strength of the marble has deteriorated with time and when this is combined with the above items the bad conditions mentioned above worsen.

On January 14, 1997, the trial court entered its judgment finding for BMA and against Skidmore on the issue of whether BMA's claims were barred by the statute of limitations. The trial court made the following findings:

1. Plaintiff's original suit was filed August 12, 1986.

2. The applicable limitation period is provided by Section 516.100 and Section 516.120 and requires that this suit be instituted within five years of the date upon which damages were sustained and capable of ascertainment.

3. The determinative issue is therefore whether damages were sustained and capable of ascertainment *before* August 12, 1981.

4. In the 1960s, B.M.A. performed repairs to the marble panels. Also during that period at least one marble panel was replaced. There was no persuasive evidence as to why that panel required replacement. The chips were caused by water getting behind the panels. Some other repairs were made to an aluminum cap and an insulated air block done to reduce the moisture problem. These repairs were done with the knowledge and approval of Defendant.

5. In 1975, the entire exterior of the building was recaulked. There was no evidence whether this work was done in whole or part as normal maintenance on a fifteen year-old building or to correct some design or construction defect with the marble cladding system.

6. There was no persuasive evidence that the chips that required repair were in any way related to the subsequently discovered defects in design and installation of the marble panels which led to the 1985 failures and the lawsuit.

7. Although the chips in the panels were indicative of some problem with the marble panels they were not so serious and substantial as to call into question the structural integrity and safety of the cladding system.

8. Protracting, offset, and displacement of panels are indications of the design and installation defects upon which the jury found in favor of Plaintiff.

9. Based upon the credible evidence, the Court does not find that Plaintiff was aware of these conditions prior to 1981.

10. Plaintiff's claims may still be time-barred if Defendant can prove that these conditions (damage) were capable of ascertainment prior to August 12, 1981.

11. There was no specific evidence of any particular displacement condition or the extent of any ascertainable condition at any particular point in time prior to the institution of suit. Although there may have been some panel movement noticeable prior to August 12, 1981 any such observations were de minimus in a system including over four thousand separate panels.

12. Therefore there was no persuasive evidence of damage consisting of panel displacement that would be sufficient to put Plaintiff on notice of or in doubt of the structural integrity and safety of the marble cladding system.

The trial court concluded that the relationship between BMA and Skidmore was that of layman and expert. It found that Skidmore failed to satisfy its burden of proof that BMA knew of the damage arising from the defective design or that ascertainable conditions existed prior to August 12, 1981, such that BMA was on notice that it had sustained damage.

### Standard of Review

■ Review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Thus, the judgment of the trial court will be affirmed unless it is against the weight of the

evidence, it is not supported by substantial evidence, or it erroneously declares or applies the law. *Id.* at 32. The appellate court is primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result. *Smith v. Estate of Harrison,* 829 S.W.2d 70, 73 (Mo.App.1992). Thus, the judgment will be affirmed if cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or not sufficient. *Id.*

■ Skidmore contends that this case should be reviewed de novo because the trial court decided the case based partly upon a stipulated record. Skidmore claims that there was "little or no conflict in the testimony received" and that this Court need not defer to the trial court. Skidmore's contentions are without merit. As discussed elsewhere in this opinion and in *BMA I,* the evidence presented by both sides was sharply in dispute. The parties agreed that the court on remand could consider the record from the first trial. They did not stipulate as to the meaning of that evidence. It is also noted that the trial court received new evidence in the hearing on remand.

■ Furthermore, this Court defers to the trial court as the finder of fact in determinations as to whether there is substantial evidence to support the judgment and whether that judgment is against the weight of the evidence, even where those facts are derived from pleadings, stipulations, exhibits and depositions. *Aviation Supply v. R.S.B.I. Aerospace,* 868 S.W.2d 118, 120 (Mo.App.1993); *see also United Serv. Auto. Ass'n Cas. v. Sorrells,* 910 S.W.2d 774, 776–77 (Mo.App. 1995); *Keener v. Wilcox Elec. Inc.,* 884 S.W.2d 744, 746 (Mo.App.1994).

### *Statute of Limitations*

Skidmore contends that the trial court erred by entering judgment in favor of BMA because BMA suffered damage capable of ascertainment more that five years before it filed suit against Skidmore. Skidmore takes issue with several of the trial court's findings, claiming that they were based upon an erroneous rule of law. Specifically, Skidmore challenges: (1) the trial court's finding in

paragraph 4 that there was no persuasive evidence as to why one marble panel was replaced in the 1960s; (2) the relevance of the trial court's finding in paragraph 4 that repairs on the building were made with Skidmore's knowledge; (3) the finding in paragraph 7 that the condition of the marble panels in the 1960s and 1970s indicated a problem, but that the problem was not serious enough to call into question the structural integrity of the cladding system; (4) the finding in paragraph 9 that the protracting, offset and displaced panels were not known to BMA prior to 1981; and (5) the finding in paragraph 11 that there was no evidence of any particular displacement prior to the filing of the lawsuit. Skidmore contends that the trial court's finding that there was no persuasive evidence on certain points was against the weight of the evidence. Skidmore supports its challenge to the findings made by the trial court by reviewing evidence in the record favorable to its position. In essence, Skidmore ignores evidence contrary to its position. As noted in *BMA I,* the evidence was "conflicting and contradicted as to when BMA could have ascertained the damage." *BMA I,* 891 S.W.2d at 446. There is nothing about this second appeal that changes the analysis of the disputed evidence as detailed in *BMA I.* The trial court in both cases, originally and on remand, found disputed factual issues in BMA's favor. Basically, Skidmore is attempting to reargue matters decided in *BMA I.* In *BMA I* the court of appeals held that Skidmore was not entitled to a directed verdict as a matter of law. *Id.* Implicit in this holding is a finding that there was evidence to support the position that BMA's damages were not capable of ascertainment prior to 1981 and, therefore, the statute of limitations had not run on BMA's claim against Skidmore.

### A. *The Policy Behind Statutes of Limitations*

■ Skidmore's challenge to the trial court's findings essentially focuses on the issue of when BMA's damages were "capable of ascertainment" within the meaning of the statute of limitations. Section 516.100 provides "that for the purposes of sections

516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment...." A five year limitation on "[a]ll actions upon contracts, obligations or liabilities, express or implied" is prescribed in section 516.120. Thus, under the applicable statute of limitation, BMA was required to file its action against Skidmore within five years of when the damage was sustained and was capable of ascertainment. Skidmore bears the burden of proving the statute of limitations as an affirmative defense. *BMA I*, 891 S.W.2d at 445.

■ The general purpose of statutes of limitation is to prevent the assertion of stale claims. *Thatcher v. De Tar*, 351 Mo. 603, 173 S.W.2d 760, 761 (Mo.1943). As this Court noted in *Baron v. Kurn*, 349 Mo. 1202, 164 S.W.2d 310, 317 (Mo.1942):

> It has been often pointed out that statutes of limitation rest upon reasons of sound public policy in that they tend to promote the peace and welfare of society, safeguard against fraud and oppression and compel the settlement of claims within a reasonable period after their origin and while the evidence remains fresh in the memory of the witnesses.

■ As noted in *BMA I*, in Missouri the statute of limitations is triggered not by discovery of damage, but by the commencement of the right to sue. *BMA I*, 891 S.W.2d at 445. These two events do not necessarily coincide. *Martin v. Crowley, Wade & Milstead, Inc.*, 702 S.W.2d 57, 58 (Mo. banc 1985). The triggering event of the applicable statute of limitations is when damage is sustained and becomes capable of ascertainment.

■ The phrase "capable of ascertainment" has never been given a precise definition. *O'Reilly v. Dock*, 929 S.W.2d 297, 300 (Mo.App.1996). It refers to the fact of damage, rather than to the exact amount of damage. *Nuspl v. Missouri Med. Ins. Co.*, 842 S.W.2d 920, 922 (Mo.App.1992). It has been construed to mean "the moment that plaintiff's damages are substantially complete." *Lockett v. Owens–Corning Fiberglas*, 808 S.W.2d 902, 907 (Mo.App.1991).

### B. Evidence of Sustaining or Ascertaining Damage

■ Skidmore claims that BMA was aware that there were problems with the marble cladding system long before it filed suit against Skidmore. It claims that the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury. What Skidmore overlooks, however, is that the problems that BMA encountered with the marble in the 1960s and the 1970s were not problems associated with the negligent design and installation of the marble cladding system. There was evidence to support the trial court finding that the pre–1981 repairs were not of the kind and degree that would put BMA on notice that the system as a whole was defective. It was not until 1985, when the panels began to fall from the building, that it became apparent that there were major flaws with design and installation.

In the 1960s, BMA performed repairs to the marble panels. Mr. Hicklin stated that he found chips of marble on the gallery deck that surrounded each floor and repaired the panels with epoxy or grout. The chips were from the column marble pieces, not the horizontal pieces, and almost always occurred at the bottoms of columns. He could not determine whether any of the panels were warped and did not see any moon-shaped cracks at the anchor locations. At least one marble panel was replaced. The trial court found that there was no persuasive evidence as to why it was replaced. Mark Crew testified that the chipping problems with the marble were remedied when expansion joints were cut in the aluminum caps. He did not witness any further problems with the marble after the joints were expanded in 1968 and after the building was recaulked in 1975. Mr. Crew testified that he had not witnessed any chipped, warped or protruding panels and that he was not told about any of these conditions. He testified that six replacement panels had been purchased because of the difficulty in matching the marble in future years, not, as suggested by Mr. Hicklin's testimony, because of fear that the panels would fall from the building. We defer to the trial court in its determination on these issues of fact and witness credibility. *Aviation Supply*, 868 S.W.2d at 120.

## Conclusion

Sufficient evidence supports the trial court's finding that BMA's damages were first capable of ascertainment in 1985 when the panels fell from the sides of the building. Sufficient evidence also supports the trial court's finding that this was the first time that the negligent design and installation of the panels could be ascertained; the first time that BMA had reason to question Skidmore's design and contract performance as it related to the marble cladding system. The evidence supports BMA's position that the problems encountered with the marble in the 1960s and 1970s were not of such nature to alert them to negligent design and installation damages.

Because suit was filed in 1986, within five years of when the damage was sustained or capable of ascertainment, the cause of action is not barred by the statute of limitations. The judgment is affirmed.

BENTON, C.J., and LIMBAUGH, COVINGTON, WHITE, HOLSTEIN and WOLFF, JJ., and HOFF, Special Judge, concur.

PRICE, J., not participating.