**Helen M. ALLEN, Plaintiff/Appellant,**

v.

**Mike KUEHNLE and Kuehnle Brothers Construction Company, Defendants/Third Party Plaintiffs/Respondents,**

and

**St. Louis Stabilizing, Inc.,[1] Third Party Defendant.**

No. ED 80727.

Missouri Court of Appeals,
Eastern District,
Division One.

Oct. 8, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 18, 2002.

Application for Transfer Denied
Jan. 28, 2003.

1. Earlier in these proceedings we granted a motion to strike the brief filed by St. Louis Stabilizing, Inc. We do not further address issues pertaining to that party.

Vatterott, Shaffar & Dolan, P.C., Paul F. Devine, Jeffrey R. Wolfe, Maryland Heights, MO, for appellant.

Wilke & Wilke, P.C., Kathy M. Wilke, James A. Wilke, St. Louis, MO, for respondent.

Wuestling & James, L.C., James D. O'Leary, St. Louis, MO, for St. Louis Stabilizing, Inc.

MARY K. HOFF, Judge.

Helen M. Allen (Allen) appeals from the judgment of the trial court granting summary judgment in favor of Mike Kuehnle and Kuehnle Brothers Construction Company, Inc. (Kuehnle). We reverse.

On or about September 25, 1992, Allen entered into a contract with Kuehnle for the construction of a new home. The lot upon which Allen's new home was built contained an older residence, which was demolished by Kuehnle before beginning construction on Allen's home. It is conceded that Allen's home was then erected by placing approximately "one-quarter of the 'footprint' of [the new home] upon the ground that was excavated by Kuehnle when removing the previous structure."

Kuehnle completed construction of the home in early 1993 and Allen moved in during May of that year. Allen noticed various problems with the home, which she included in a "punch list" dated August 24, 1993. Her list of 26 problems included a nicked vanity, a cracked toilet seat, a door frame installed improperly, "nail pops", hairline cracks in the drywall, drywall tape pulling away from the walls in places, a gap between the brick walls and the foundation which caused water seepage and a rodent infestation, two sections of the sidewalk which were sloping, a few areas where carpet bulged, an inoperable light and electrical socket, a light that would not operate when the dishwasher was running, gutters improperly sized, and loose shingles on the roof. Allen asserted in her affidavit that she "was of the opinion, and informed by several people, that these types of problems were typical when one moves into a newly constructed residence." It appears from the record that Kuehnle repaired or attempted to repair most of these problems.

Then in 1998 Allen claims she "began to notice numerous new, more dramatic, problems with her home." Allen reported that the foundation and exterior brick walls were cracked and separating; large cracks in the drywall developed, including a "huge ... L-shaped crack" in the family room; and drywall tape was pulling away from the walls in nearly every room. Additionally she observed that "many of the doors and windows in the home were pinched [and had] shifted out of plumb and ... no longer operate[d] properly." The driveway had sunk so low that Allen stated she could not remove her riding lawnmower from the garage without damaging it; and the front sidewalk had settled and was uneven and "posed a danger to traverse."

In June of 1998 Allen hired an engineer to inspect the home. In his affidavit the engineer opined that the property "suffered from severe movement due to the fact that the [p]roperty was not erected upon sufficiently compacted soil" and extraordinary repairs were required to stop the settlement. On the engineer's recommendation, Allen arranged to have her home piered by St. Louis Stabilizing, Inc. d/b/a Perma–Jack of St. Louis (Perma–Jack). The piering process generated a substantial amount of dust and debris. Allen claims that while vigorously cleaning

the dust generated by the piering work, she developed a sore on her foot which became infected and resulted in a hospital stay and damages in the amount of $3,667.25.

Allen filed suit on November 16, 1999, claiming breach of contract, negligent performance of the contract, negligence (essentially claiming breach of the implied warranties of habitability and construction in a skillful and workmanlike manner), and seeking recision of the contract. Kuehnle then filed a motion for summary judgment arguing Allen's claims related to the construction of her home were barred by the statute of limitations because she failed to bring suit within five years of ascertaining there were structural problems with the home, and her personal injury was not foreseeable by Kuehnle at the time of performance of the construction contract. The trial court granted Kuehnle's motion for summary judgment on Allen's petition finding no genuine issue as to material facts and holding that Kuehnle was entitled to judgment as a matter of law. Allen appeals.

In appeals from summary judgment, we "review the record in the light most favorable to the party against whom judgment was entered" and our review is essentially *de novo. ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Whether to grant summary judgment is purely an issue of law. *Id.* Because the trial court's judgment is based upon the record submitted and the law, we "need not defer to the trial court's order granting summary judgment." *Id.* The criteria on appeal for testing the propriety of summary judgment are no different from those which are employed by the trial court to determine propriety of sustaining the motion initially. *Id.*

The burden is on the movant to show a right to summary judgment flowing from facts about which there is no genuine dispute. *Id.* at 387; *Miller v. Big River Concrete, LLC*, 14 S.W.3d 129, 130 (Mo. App. E.D.2000). The non-movant must then show by affidavit, depositions, or otherwise that one or more material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed. Id. at 381. A "genuine issue" exists when the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts. *Id.* at 382. "A 'genuine issue' is a dispute that is real, not merely argumentative, imaginary or frivolous." *Id.*

Allen raises four points on appeal alleging the trial court erred in granting Kuehnle's motion for summary judgment. In her first three points, Allen contends the trial court erred in sustaining Kuehnle's motion for summary judgment on the grounds the construction contract claims were barred by the statute of limitations.

The applicable limitations period is provided by Section 516.120 RSMo 1986.[2] That statute requires that Allen's suit for the construction contract related claims be instituted within five years of the date upon which damages were sustained and capable of ascertainment. The determinative issue, therefore, is whether Allen's construction related damages were sustained and capable of ascertainment before November 16, 1994, five years before Allen filed suit against Kuehnle.

"The phrase 'capable of ascertainment' has never been given a precise definition." *Business Men's Assur. Co. of*

---

**2.** Section 516.120(1) provides "[a]ll actions upon contracts, obligations, or liabilities, ex-press or implied ..." must be commenced within five years.

*America v. Graham,* 984 S.W.2d 501, 507 (Mo. banc 1999). Capable of ascertainment refers to the fact of damage, rather than to the exact amount of damage. *Id.* "When the *fact of damage* becomes capable of ascertainment, the statute of limitations is put in motion." *O'Reilly v. Dock,* 929 S.W.2d 297, 301 (Mo.App. S.D.1996) (*quoting M & D Enterprises, Inc. v. Wolff,* 923 S.W.2d 389, 394 (Mo.App. S.D.1996)).

■ Normally, the running of the statute of limitations is a question of law for the court to decide. *Lomax v. Sewell,* 1 S.W.3d 548, 552 (Mo.App. W.D.1999). However, when contradictory or differing conclusions can be drawn from the evidence as to whether the statute has run, it is a question of fact for the jury to decide. *Id.* at 552–53.

■ Kuehnle claims Allen's damages to her home were capable of ascertainment in 1993 when Allen prepared her "punch list", more than five years before filing suit. In support of this argument Kuehnle first directs us to Allen's deposition testimony in which she reported "[t]here is a huge crack in the family room." In her deposition taken June 15, 2000, Allen said that she informed Kuehnle in 1993 about an "L-shaped" crack in the wall of the family room. However, it is unclear to us from the record whether this "L-shaped" crack was "huge" in 1993, or whether it had grown by the time of the deposition in 2000 when Allen reported the crack "is [ ] huge."

Kuehnle next argues that Allen's own expert testified the problems Allen experienced in 1993 were clear indications of settlement. The testimony Kuehnle cites to addresses problems the engineer observed in 1998. Regarding the problems in 1993, the engineer testified that he would expect to see some evidence of movement "within the first six months or a year. But ... [the settlement] wouldn't

be very noticeable.... It might go down an eighth of an inch." Furthermore, the engineer concluded that he did not "believe that the minor problems experienced in 1993, by themselves, could have indicated to ... Allen the substantial settlement or compaction problem with the soil."

We disagree with Kuehnle's assertion that this testimony shows no genuine issue in dispute. The testimony and evidence regarding the "L-shaped" crack in the family room and the items on Allen's "punch list" lead to contradictory or differing conclusions as to when Allen's damages were reasonably ascertainable. Furthermore, the expert's testimony regarding the possibility of settlement within the first year does not require us to find that Allen undoubtedly experienced settlement during the first year. Because contradictory conclusions can be drawn from the evidence a genuine issue of material fact exists and the trial court erred in granting Kuehnle's motion for summary judgment regarding Allen's construction contract claims.

Kuehnle argues that *O'Reilly,* 929 S.W.2d 297, and *Arst v. Max Barken, Inc.,* 655 S.W.2d 845 (Mo.App. E.D.1983), require us to find Allen's construction contract related claims are barred by the statute of limitations. In *O'Reilly,* the plaintiffs hired the defendant to build an addition to their house. *O'Reilly,* 929 S.W.2d at 298. Shortly after the addition was completed in 1983, which included the installation of a number of large wooden windows, the plaintiffs began to experience leaks. *Id.* at 299. In 1986, carpenters told the plaintiffs that the window frames had rotted excessively. *Id.* From 1986 onward, the plaintiffs repeatedly attempted to remedy the leaks without success. *Id.* Carpenters who worked on the windows in 1987 and 1988 reported "some kind of a moisture problem" around the

windows, but could not locate the source of the moisture. *Id.* In 1989 the plaintiffs reported a mildew smell in the house that progressively worsened until a dehumidifier was installed in 1990. *Id.* In 1992, the plaintiffs hired a builder to replace the entire bank of leaking windows. *Id.* Upon removing the exterior brick wall from the addition, the builder discovered "extensive rot damage in the wooden rim joists and sill along the north wall area" where the windows were located. *Id.* The builder concluded the windows had been "improperly flashed at the top," and that the leaking window problem was "complicated . . . considerably [by] the fact that . . . there was no crawl space . . . under the house." *Id.* (quotations omitted.)(quoting the builder). The plaintiffs hired an expert who determined the defendant's failure to install a proper crawl space under the addition was both a breach of contract, and a breach of good building practice. *Id.*

The trial court found the improper installation of the windows caused the windows to leak and resulted in water damage "which was apparent more than five years before suit was filed." *Id.* at 298. The trial court ruled that the plaintiffs were not entitled to recover for any damage resulting from the leaking windows because that claim was barred by the statute of limitations. *Id.* However, the court awarded the plaintiffs damages on the claim that the defendant breached the contract by not building a crawl space under the addition of the size specified in the plans. *Id.* The defendant appealed asserting the claim related to the lack of crawl space was also barred by the statute of limitations. *Id.* The plaintiffs argued on appeal, that they did not know of and could not "reasonably have ascertained" the defendant's breach of contract regarding the crawl space until 1992. *Id.* at 300. The Southern District reversed the judgment of the trial court finding that the plaintiffs

were capable of ascertaining some loss from the defendant's breach more than five years prior to filing suit because they experienced leaks as early as 1983, which led to discovery of the crawl space problem. *Id.* at 301. The appellate court reasoned that while the plaintiffs were not aware of the extent of the damage when the leaks began, they were aware of the fact of damage more than five years before filing suit. *Id.* at 302.

Likewise in *Arst*, the plaintiffs' claim was barred by the statute of limitations for failure to bring suit within five years after ascertainment of damages. *Arst*, 655 S.W.2d at 847. The plaintiffs entered into a contract with defendant to purchase a residence constructed by the defendant. *Id.* at 846. In June of 1969, within the first month of occupying the residence, the plaintiffs discovered cracks and shifting of the foundation. *Id.* In October of 1971 and January of 1974, the plaintiffs notified the defendant of continued leaks and additional cracks despite the defendant's previous attempts to repair them. *Id.* Employees of the defendant inspected the residence in 1974 and again in 1975, and in 1976 notified the plaintiffs that the cracking was "a result of underlying soil conditions which caused the vertical settling of the residence." *Id.* The defendant hired a third party "to underpin the foundation and patch the cracks in [the plaintiffs'] residence." *Id.* Sometime after August 1979, because settling continued, the plaintiffs hired two soil engineering firms which inspected the residence and concluded the residence was not settling vertically, but rather was sliding horizontally down the slope. *Id.* at 847. The soil engineers attributed the sliding to the fact that the defendant had rechanneled an adjacent creek without stabilizing the slope prior to construction. *Id.* The plaintiffs sued alleging the defendant breached an express and

implied warranty that the residence was constructed in a good and workmanlike manner. *Id.* The defendant filed a motion for summary judgment claiming the plaintiffs' suit was barred by the statute of limitations for failure to bring suit within five years of ascertaining their damages. *Id.* The trial court granted the defendant's motion for summary judgment. *Id.* This Court affirmed the judgment of the trial court finding "there was just one wrong committed here, not continuing wrongs." *Id.* We concluded that the plaintiffs' cause of action accrued in 1969 when they discovered cracks and shifting of the house's foundation because at that time the damages were sustained and capable of ascertainment, and therefore the plaintiffs' claims were barred by the statute of limitations. *Id.*

We find the *O'Reilly* and *Arst* cases distinguishable from the case before us. In those cases, the damage ultimately discovered and sued upon was proximately related to the problems experienced by the plaintiffs prior to five years before filing suit. In the case before us, however, we find the problems Allen experienced before 1998 were not problems related to settlement or faulty soil compaction. Based on the testimony and affidavits in the record, we find the problems in Allen's 1993 "punch list" were not of the sort that would indicate to a reasonable person that the home's foundation was faulty, but rather were typical problems commonly experienced in a newly constructed residence.

We find the case before us more akin to *Business Men's Assur. Co.* In *Business Men's Assur. Co.*, the plaintiff contracted with the defendant to build the plaintiff's office tower clad in marble. *Business Men's Assur. Co.*, 984 S.W.2d. at 502. Beginning in 1966, small pieces of marble chipped and fell from the building. *Id.* at 503. Later in the 1960's and 1970's, the

plaintiff experienced problems with moisture behind the marble panels. *Id.* at 504. In 1985, entire marble panels began to fall off the building. *Id.* at 503. The plaintiff filed suit in 1986. *Id.* at 505. The defendant claimed the plaintiff's cause of action was barred by the five-year statute of limitations because the plaintiff suffered damages capable of ascertainment as early as 1966. *Id.* at 506. The trial court found the claim was not barred by the statute of limitations because the plaintiff brought suit within five years after ascertaining damages. *Id.* at 502. The Missouri Supreme Court affirmed finding that the problems the plaintiff encountered with the marble in the 1960's and 1970's were not problems with the negligent design and installation of the marble panels. *Id.* at 507. The Court held that it was not until 1985, when entire panels began to fall from the building, that it became apparent there were major flaws with the design and installation. *Id.* Accordingly, the Court found the plaintiff's damages were not capable of ascertainment until 1985, less than one year before the plaintiff filed suit, and therefore the plaintiff's claim was not barred by the statute of limitations. *Id.* at 508.

Likewise, in the case before us, we find the damages pertaining to Allen's construction contract related claims were not capable of ascertainment when Allen prepared her "punch list" in 1993 as Kuehnle argues. Based on the Missouri Supreme Court's decision in *Business Men's Assur. Co.*, we find genuine issues of material fact in the record before us and believe the trial court's order granting summary judgment was not appropriate.

Points one through three are granted.

■ In her fourth point, Allen claims the trial court erred in granting summary judgment on her claim for personal injuries. Allen claims Kuehnle's failure to test

and compact the soil prior to construction was the proximate cause of her injury because the faulty construction caused the house to require piering and Allen was injured as a result of the piering process. Allen asserts the piering process generated a substantial amount of dust and debris, and that while vigorously cleaning the house she developed a sore on her foot that became infected and resulted in a hospital stay and damages in the amount of $3,667.25. Allen further maintains that her injury was reasonably foreseeable and that Kuehnle's failure to properly remove the previous structure and compact the soil should have provided Kuehnle with actual or constructive knowledge that there was some probability that someone could be injured due to the negligent construction.

The elements of a claim for negligence require a plaintiff to show that (1) the defendant owed a duty to the plaintiff; (2) the defendant failed to perform that duty; and (3) the defendant's breach of that duty was the proximate cause of the plaintiff's injury. *Finocchio v. Mahler*, 37 S.W.3d 300, 302 (Mo.App. E.D.2000). The plaintiff has the burden of establishing each element and if any element is not established, the defendant is entitled to summary judgment. *Id.*

"A defendant's duty is measured by the scope of foreseeable, unreasonable risks." *Chemical Design, Inc. v. American Standard, Inc.*, 847 S.W.2d 488, 490 (Mo.App. E.D.1993). A risk of injury is foreseeable when a defendant is shown to have had actual or constructive knowledge that there is a probability of injury such that an ordinary person would take precautions to avoid it. *Id.* The test for proximate cause is whether the plaintiff's injury is the natural and probable consequence of the defendant's negligence. *Reed v. Kelly*, 37 S.W.3d 274, 277 (Mo.App. E.D.2000).

Allen argues she presented evidence that her injury was directly and proximately related to the dust created by the piering process, a remedial measure Allen used to correct Kuehnle's failures. Allen presented the affidavit of her treating physician, which says "[i]n my professional medical opinion, the cause of Ms. Allen's cellulitis, for which she was hospitalized, was the dust and debris present in her basement in 1998."

Allen further argues the record contains evidence that Kuehnle failed to conduct any soil tests on the lot before beginning construction, and failed to build a home free from latent and structural defects. Allen asserts Kuehnle knew or should have known that soil tests should have been conducted to assure the structural stability of the ground before building the home. Allen contends it is reasonable for a builder to foresee that if a home is built upon earth that was not properly compacted, it will settle and require piering to resolve the settlement problem. Allen maintains her injuries were proximately caused by Kuehnle's failure to compact the soil and were a reasonably foreseeable consequence of Kuehnle's failure.

After a careful review of the record, we find the testimony and evidence presented could lead to differing or contradictory conclusions as to whether Allen's injury was foreseeable by Kuehnle and whether the allegedly faulty construction was the proximate cause of Allen's injury. These are issues for a jury to resolve. We conclude genuine issues of material fact exist, and summary judgment was not proper.

Point four is granted.

The judgment of the trial court granting Kuehnle's motion for summary judgment is reversed and remanded to the trial court

for proceedings consistent with this opinion.[3]

ROBERT G. DOWD, JR., Presiding Judge and GEORGE W. DRAPER III, Judge: Concur.

---

**3.** Allen's reply brief contains a motion to strike Kuehnle's "additions and amendments" to Allen's statement of facts. Motion denied.