ASHFORD CONDOMINIUM, INC. a/k/a Ashford Condominium Owners' Association, Appellants,

v.

HORNER & SHIFRIN, INC., and Lamb Construction Company, LLC, Respondents.

No. ED 94645.

Missouri Court of Appeals, Eastern District, Division Four.

Nov. 16, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 21, 2010.

Application for Transfer Denied Jan. 25, 2011.

Steve Koslovsky, LLC, St. Louis, MO, for Appellant.

Philip J. Christofferson, Cockriel & Christofferson, LLC, St. Louis, MO, for Respondent Horner & Shifrin, Inc.

R.C. Wuestling, M. Adina Johnson, Matthew T. Nagel, Wuestling & James, L.C., St. Louis, MO, for Respondent Lamb Construction Company, LLC.

KURT S. ODENWALD, Presiding Judge.

## Introduction

Ashford Condominium, Inc. (Ashford) appeals from the judgment of the trial court granting summary judgment in favor of defendants Horner & Shifrin, Inc. (Horner) and Lamb Construction Company, LLC (Lamb). In 2008, Ashford filed a petition seeking damages for breach of contract and negligence against Horner and Lamb in connection with repair work performed on exterior structures of the condominium complex in 2000. The trial court found that Ashford's claims were not brought within the time limits required by law and were barred by the applicable statute of limitations, Section 516.120 RSMo 2000.[1] We affirm the trial court's judgment.

---

1. All subsequent statutory citations are to RSMo 2000, unless otherwise indicated.

*Factual Background*

Ashford is an incorporated association of condominium owners of a condominium development known as Ashford Condominiums. On August 6, 1999, Ashford hired Horner, an engineering firm, to analyze the development's wooden decks, balconies, and other exterior structures (collectively "decks") for deterioration and to recommend any necessary remedial work. Horner determined that the decks suffered from "weathering and moisture damage" and recommended several repair options to Ashford. Ashford directed Horner to analyze the decks' structural columns (hereinafter "columns") and recommend which columns could be repaired and which columns needed total replacement.

On April 25, 2000, Ashford hired Lamb to, among other things, repair and replace the columns in accordance with Horner's recommendations. Horner further agreed to provide periodic "inspections" to confirm that the construction tasks performed by Lamb were in fact consistent with its recommendations. Because a decorative trim encased each column, Horner was unable to determine the extent of each column's damage without Lamb first removing the decorative trim. Once Lamb did so, Horner examined each exposed column and recommended whether it needed to be completely replaced, could be repaired, or was fine as is. Lamb then followed Horner's replace/repair/leave alone designations and later installed new decorative trim.

On November 27, 2000, Ashford sent a letter to Horner stating that it had "serious concerns" regarding Lamb's quality of work and was "extremely dissatisfied" with Horner's ability to "properly inspect" Lamb's work. Ashford continued to express its dissatisfaction with Horner and Lamb in subsequent correspondence and ultimately terminated Lamb's contract on March 20, 2001. Because Lamb had not finished painting the decks and caulking the wood joints and nail holes when it was terminated, Ashford hired Rice Painting Co. (Rice Painting) to complete these tasks.

Nearly five years elapsed, and, in 2006, Ashford noticed that certain wooden components of the decks appeared unsightly. On October 19, 2006, Ashford hired another contractor, Raineri Construction, LLC (Raineri), to perform some repairs and repaint the decorative trim that covered the decks' columns. Upon removing the decorative trim, Raineri discovered deterioration in the columns and notified Ashford. Ashford hired engineer Gerald Loesch (Loesch) to investigate this deterioration. Loesch found "considerable rotting as a result of water infiltration," infiltration that had taken place "gradually over many months as moisture repeatedly penetrate[d] and damage[d] the wood." Loesch further determined that the decks were structurally unsafe. As a result, Ashford directed Raineri to replace the decks in their entirety.

*Procedural Background*

Ashford filed its petition in this case against Horner and Lamb on March 14, 2008, and filed an amended petition on October 17, 2008. In its amended petition, Ashford asserted negligence and breach of contract claims. Ashford claimed Horner was negligent in providing engineering services and breached its contract with Ashford because Horner's plan to repair the decks "failed to specify flashing required to protect wood components against excessive deterioration" and it "failed to properly supervise Lamb in [the] performance of [Lamb's] work." Ashford claimed that Lamb negligently provided construction services and breached its contract with Ashford because it failed to install

proper flashing and did not follow Horner's recommendations.

Both Horner and Lamb filed motions for summary judgment. On March 10, 2010, the trial court sustained their summary judgment motions, concluding that the five-year limitation period of Section 516.120 barred each of Ashford's claims. The trial court found that Ashford had sustained damages that were capable of ascertainment toward the end of 2000. The court explained that "Ashford had actual notice of [Horner] and Lamb's allegedly negligent acts [ ] and breaches of contract in 2000." At that time, Ashford was aware that "the alleged failure to install flashing would lead to water infiltration and damage." This awareness of the fact of damage, according to the trial court, triggered the five-year limitation period. This appeal follows.

*Point on Appeal*

On appeal, Ashford argues that the trial court erred in granting summary judgment for two reasons. First, Ashford contends that whether it possessed knowledge that flashing was not properly installed in 2000 was a disputed fact, thereby precluding the entry of summary judgment. Second, Ashford contends that the damages it suffered as a result of Horner and Lamb's alleged negligence and contractual breaches were not sustained and capable of ascertainment until October of 2006 when Raineri removed the columns' decorative trim, uncovered the structural deterioration, and apprised Ashford of the condition of the wooden columns. Consequently, Ashford argues that the 5–year limitations period did not begin to run until October, 2006.

*Standard of Review*

■ In an appeal from summary judgment, we review the record in the light most favorable to the party against whom judgment was entered, and our review is essentially *de novo*. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Whether to grant summary judgment is purely an issue of law. *Allen v. Kuehnle*, 92 S.W.3d 135, 138 (Mo.App. E.D.2002). Because the trial court's judgment is based upon the record submitted and the law, we need not defer to the trial court. *Id.* The criteria on appeal for testing the propriety of summary judgment are no different than those employed by the trial court. *Id.* The movant carries the burden of showing a right to summary judgment flowing from facts about which there is no genuine dispute. *Id.* The nonmovant then must show by affidavit, depositions, or otherwise that one or more material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed. *Id.*

*Discussion*

Neither party disputes that the five-year limitation period of Section 516.120 governs Ashford's claims in this case. Subject to certain exceptions which are inapplicable here, Section 516.120(1) states that contract actions must be brought within five years of their accrual. Section 516.120(4) provides that general tort actions, like Ashford's negligence claims, must be brought within five years of their accrual. *See, e.g., Bus. Men's Assurance Co. of Am. v. Graham*, 984 S.W.2d 501, 503–507 (Mo. banc 1999) (applying Section 516.120 where the owner of a building sued architects and engineers for both negligence and breach of contract). The central question before us is whether Ashford's petition was timely filed. Ashford's petition was filed on March 14, 2008. The determinative issue, therefore, is whether Ashford's claims were sustained and capa-

ble of ascertainment before March 14, 2003, five years before Ashford filed its suit against Horner and Lamb.

In Missouri, "the statute of limitations is triggered not by discovery of damage, but by the commencement of the right to sue." *Id.* at 507. These two events do not necessarily coincide. *Id.* at 507. Section 516.100 states that:

> [T]he cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

The Missouri Supreme Court has interpreted Section 516.100's capable of ascertainment standard to be an objective standard and has held that *"the statute of limitations begins to run when the 'evidence was such to place a reasonably prudent person on notice of a potentially actionable injury.'"* *Powel v. Chaminade College Preparatory, Inc.,* 197 S.W.3d 576, 582 (Mo. banc 2006) (quoting *Graham,* 984 S.W.2d at 507) (emphasis in original). The test to be applied is "when a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages." *State ex rel. Marianist Province of the United States v. Ross,* 258 S.W.3d 809, 811 (Mo. banc 2008) (citation omitted). Thus, "[i]n order for the statute [of limitations] to accrue, plaintiff must have knowledge of the wrong and at least nominal damage, or [knowledge] of something that puts plaintiff on notice to inquire further." *Gaydos*

*v. Imhoff,* 245 S.W.3d 303, 307 (Mo.App. W.D.2008).

The Court has also explained that the phrase "capable of ascertainment" refers to "the fact of damage, rather than to the exact amount of damage." *Graham,* 984 S.W.2d at 507; *Klemme v. Best,* 941 S.W.2d 493, 497 (Mo. banc 1997) ("All possible damages do not have to be known, or even knowable, before the statute accrues."); *Dixon v. Shafton,* 649 S.W.2d 435, 438 (Mo. banc 1983) ("The word 'ascertain' has always been read as referring to the fact of damage, rather than to the precise amount."). Thus, "[d]amages are ascertained when the fact of damage appears, not when the extent or amount of damage is determined." *Kennedy v. Microsurgery & Brain Research Inst.,* 18 S.W.3d 39, 42 (Mo.App. E.D.2000). "When the *fact of damage* becomes capable of ascertainment, the statute of limitations is put in motion." *Kuehnle,* 92 S.W.3d at 139 (emphasis in original) (citation omitted).

In this case, Ashford designated for deposition Harold Zimmerman (Zimmerman) as its corporate representative under Rule 57.03(b)(4).[2] Zimmerman served as the president of Ashford's board of directors at the time when Ashford hired Horner and Lamb. Zimmerman's tenure as president lasted for much of the construction project's duration until he resigned in December of 2000. Under Rule 57.03(b)(4), an organization named as a party "shall designate" a corporate representative to testify on its behalf, and the "persons so designated shall testify as to matters known or reasonably available to the organization." The statements made by a corporate representative "will be admissible against and binding on the corporate party." *State ex rel. Reif v. Jamison,* 271 S.W.3d 549, 551 (Mo. banc 2008).[3]

---

**2.** All rule citations are to Mo. R. Civ. P.2009, unless otherwise indicated.

**3.** In its reply brief and at oral argument, Ashford argued that when the *Jamison* Court

According to Zimmerman, over the course of the project John Coonrod (Coonrod) and Jack Kellogg (Kellogg), two Ashford residents "knowledgeable about construction business," regularly kept Ashford apprised of "what was not being done right." Zimmerman testified that Coonrod and Kellogg "lived in these condos, so they would observe [the project] almost daily." Zimmerman added that "Kellogg had a camera and he was taking pictures all over the place every single day" and "[a]nytime they'd find something they'd come up to [Zimmerman] and tell [him] what they found and [he would] make a note of it and bring it up at the [Ashford] Board meeting." The following testimony illustrates the types of concerns of which Ashford was aware toward the end of 2000:

[Question]: Mr. Zimmerman, . . . what were those complaints that people had throughout Lamb's work?

[Answer]: Okay. That the nails were supposed to be countersunk and they were not; *flashing was supposed to be taken care of and was not.*

[Question]: I'm sorry?

[Answer]: *Flashing to prevent water damage was supposed to be done and was not;* [ ] the new wood theoretically was not new in a sense, that it was damaged wood that was going in and we saw that. So those are just some of the complaints that we spotted.

[Question]: Were there any others?

[Answer]: There could have been. I don't remember every—it's been nine years since I've been there.

[Question]: Okay. But people at [Ashford] were aware that there was an issue with countersinking nails?

[Answer]: Absolutely.

[Question]: *That there was a problem with flashing?*

[Answer]: *Absolutely.*

[Question]: And that there was a problem with installing wood that people thought was damaged or warped?

[Answer]: That's correct.

[Question]: *What was the flashing that was supposed to be taken care of?*

[Answer]: *I just know what the guys told me. Remember, I told you about Coonrod and Kellogg?*

[Question]: *What did they tell you?*

[Answer]: *Those were the experts. They said flashing had to be done in order to prevent water damage. That's the word we got at [Ashford].* Not being an architect, I can't tell you that. Not being a construction worker, I can't tell you that. I can only tell you what I know.

[Question]: *So sometime in 2000 Coonrod and Kellogg come to [Ashford] and they say flashing needs to be done and it's not being done?*

[Answer]: *Right.*

[Question]: Who do you believe was responsible for not installing that flashing?

[Answer]: Well, primarily the contractor was Lamb, and the supervisor which is Horner [ ], because they were told about [this]. . . .

[Question]: How did Ashford address these complaints with Lamb?

[Answer]: We sent letters. . . . [W]e sent letters to Horner [ ], so that ev-

referred to a corporate representative's testimony as "binding" on the represented organization, the Court did not intend to suggest that such testimony was immune from additional evidence demonstrating such testimony's purported inaccuracies. We find this argument to be of no consequence in this case. As our decision makes clear, *infra,* we find nothing in the record that contradicts the facts to which Zimmerman testified.

erybody knew what the situation was, and sometimes we withheld payment. (emphasis added). One of the letters referenced by Zimmerman in his testimony was dated November 27, 2000, and was directed to Horner's attention. The letter stated the following:

As you know from the inspection done by [Ashford] on November 14, 2000, [Ashford] has very serious concerns about the workmanship on this project. The specific concerns relate to the carpentry joints, weather proofing and the quality of the painting and caulking that has been done. . . .

Another area of concern to [Ashford] is the inspection work done by Horner [ ]. . . . [Ashford] is extremely dissatisfied with the work of Horner [ ] in fulfilling its obligations to properly inspect the work done by Lamb and insisting that Lamb follow the contract specifications that Horner [ ] developed.

Both Zimmerman's deposition testimony and the November 27 letter indicate that as early as 2000 Ashford was aware of, and expressly relayed concerns regarding, the facts its amended petition alleged to constitute negligence and contractual breach, namely Lamb's inadequate installation of flashing and Horner's incompetent supervision of Lamb's work. In addition, Zimmerman's testimony shows that Ashford specifically knew that poor flashing installation would lead to water damage in the future. Ashford argues that Zimmerman's recollection was simply erroneous. Ashford further asserts that the absence of any explicit mention of the word "flashing" in either the complaint letters or "punch list" sent to Horner and Lamb creates a genuine dispute as to what Ashford actually knew in 2000, thereby defeating summary judgment. We disagree.

When reviewing the pleadings, depositions, and affidavits of this case in the light most favorable to Ashford, we find the record lacks any materials plausibly evidencing a version of events contrary to those articulated by Zimmerman, Ashford's corporate representative. *Kuehnle*, 92 S.W.3d at 138 ("A 'genuine issue' exists when the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts."). Even the deposition testimony and affidavits provided by Ashford's two additional designated corporate representatives, Mary Layton and Stanley Richert, offer nothing to suggest that Zimmerman's recollection was inaccurate in any respect. Thus, the fact that Ashford had reason to believe in 2000 that flashing was inadequately installed is above genuine dispute.

Accordingly, our discussion turns to whether Ashford's awareness of this matter was sufficient to place a reasonably prudent person on notice of a potentially actionable injury, *Powel*, 197 S.W.3d at 582, thus setting into motion Section 516.120, the applicable five-year statute of limitations. Ashford argues that its damages were not sustained and capable of ascertainment until October 2006, when Raineri discovered the columns' structural deterioration and brought the matter to Ashford's attention.

In support of this position, Ashford relies on *Linn Reorganized Sch. Dist. v. Butler Mfg. Co.*, 672 S.W.2d 340 (Mo. banc 1984). In *Linn*, the plaintiff contracted for the building of a school and fieldhouse. *Id.* at 341. The fieldhouse's dome roof was completed in July 1972, but payment due to the sub-contractor who installed the roof was withheld because a leak was discovered immediately. *Id.* at 341. The remainder of the project continued amid requests that the sub-contractor fix the leak, and a gymnasium floor was installed in November 1972. *Id.* at 341. The sub-contractor neglected to fix the leak, so its

contract was terminated in July 1973. *Id.* at 341. The plaintiff filed suit in October 1977, seeking a judgment for damages to the roof and gymnasium floor. *Id.* at 341. Although the plaintiff knew that the roof leaked in July 1972, more than five years prior to its time of filing, the Missouri Supreme Court held that Section 516.120's five-year limitation period did not bar the plaintiff's claims because damages were not capable of ascertainment in July 1972. *Id.* at 342 ("[T]he mere evidence that the roof leaked from the first day of construction is not supportive of a conclusion that damages as of that time were ascertainable."). In so holding, the Court relied heavily on the fact that the roof leakage occurred before the entire construction project was completed. *Id.* at 342. The court reasoned that to require a suit be filed the moment evidence of an alleged faulty condition arose could require a plaintiff to sue long before a lengthy construction project was completed. *Id.* at 342; *see Hasemeier v. Metro Sales, Inc.,* 699 S.W.2d 439, 442–43 (Mo.App. E.D. 1985) (discussing *Linn*). In addition, *Linn* accorded weight to the proposition that a "statute of limitations does not begin to run in a contract action until the time allowed for correction of defects has passed." *Linn,* 672 S.W.2d at 344; *Loeffler v. City of O'Fallon,* 71 S.W.3d 638, 642–43 (Mo.App. E.D.2002).

 Even if *Linn* tolls the ascertainment of damages arising from an ongoing construction project until after the project culminates, Ashford's claims are still untimely. The record indicates that Ashford terminated Lamb's construction services and completed the project in 2001 [4], still approximately seven years prior to the filing of its petition. Zimmerman's testimony shows that by that time, Ashford actually knew "[f]lashing to prevent water damage was supposed to be done and was not [done]." In addition, Ashford specifically expressed in the November 27 letter that, after inspecting the project, it was "extremely dissatisfied with the work of Horner [ ] in fulfilling its obligations to properly inspect the work done by Lamb." The only matter still unknown to Ashford in 2001 was the extent of water damage inadequate flashing would cause to its wooden decks over time. Yet, knowledge of the extent of damage is not necessary in Missouri to trigger the running of a statute of limitations. Mere knowledge of the fact of damage, such that a reasonable person in the plaintiff's position would be alerted to a potentially actionable injury, is sufficient. *Powel,* 197 S.W.3d at 582; *see, e.g., O'Reilly v. Dock,* 929 S.W.2d 297, 301–02 (Mo.App. S.D.1996) (holding that, when plaintiffs knew that window leaks in their home were causing damage but did not know the extent of the damage the leaks had caused, plaintiffs' damages were sustained and capable of ascertainment); *Arst v. Max Barken, Inc.,* 655 S.W.2d 845, 848 (Mo.App. E.D.1983) (where plaintiffs noticed cracks and a shifting of their foundation and knew who caused this harm in August 1969 yet neglected to employ an expert to determine the extent of damage until August 1979, this Court held that the statute of limitations began to run in August 1969). By Ashford's corporate representative's own uncontradicted admission, Ashford possessed knowledge of the fact of damage toward the end of 2000 and early in 2001 when the decks' project finally culminated.

Moreover, this case is not one where the observations and complaints Ashford made in 2000 regarding Horner and Lamb's work were of a different nature and/or

---

4. Lamb's contract was terminated on March 20, 2001. Rice Painting was hired on April 15, 2001, to complete the painting and caulking work left undone by Lamb.

degree than those of which Ashford complained in 2008 when it filed its petition. *Cf. Graham*, 984 S.W.2d at 507–08 (holding that, though a plaintiff experienced problems in the 1960s and 1970s with moisture gathering behind the marble panels that clad its office tower, the plaintiff's negligent design/installation claim did not accrue until 1985 when entire panels began to fall from the building); *Martin v. Crowley, Wade & Milstead, Inc.*, 702 S.W.2d 57, 58 (Mo. banc 1985) (where nothing in the record indicated that "plaintiffs knew or should have known of any reason [ ] to question [the] defendant's work," the Court held that damages stemming from the defendant's negligent surveying services were not capable of ascertainment until plaintiffs discovered the error eight years later). Rather, the record in this case shows that as early as 2000 Ashford specifically took issue with Lamb's purported inadequate installation of flashing and Horner's supervision thereof. Yet, Ashford's petition asserting any claims it may have had regarding these exact complaints was not filed until 2008.

The evidence before us conclusively proves that Ashford had reason to believe that an inadequate installation of flashing plagued the decks' construction project more than five years prior to the time Ashford filed its petition. Ashford had notice of a potentially actionable injury toward the end of 2000 and early in 2001 when the project was finally completed, but did not file its lawsuit against Horner or Lamb until 2008. By delaying commencement of its suit, Ashford permitted the five-year limitations period of Section 516.120 to foreclose any remedy it may have had against Horner and Lamb on its claims. We hold that summary judgment in favor of Horner and Lamb is supported by the evidence before us. Point denied.

*Conclusion*

The judgment of the trial court is affirmed.

ROBERT G. DOWD, JR. and NANNETTE A. BAKER, JJ., Concur.