**John C. PATY, Respondent,**

v.

**DIRECTOR OF REVENUE, STATE OF MISSOURI, Appellant.**

**No. ED 84646.**

Missouri Court of Appeals,
Eastern District,
Division Three.

May 31, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 18, 2005.

Application for Transfer Denied
Aug. 30, 2005.

Jeremiah W. (Jay) Nixon, Atty. Gen., Robert L. Ortbals, Jr., Jefferson City, MO, for appellant.

Carl M. Ward, Chesterfield, MO, for respondent.

NANNETTE A. BAKER, Judge.

The Director of Revenue ("Director") revoked the license of John Paty ("Driver") pursuant to Section 302.505[1] after Driver was involved in a single vehicle accident. Driver filed a Petition for Trial De Novo and his case was considered on March 5, 2004. The trial court found that the officer did not have probable cause to arrest Driver and reinstated his driving privileges. The Director appealed.

**Background**

On May 5, 2003, at approximately 3:12 pm, Driver was involved in a single vehicle accident that occurred in Osage County, Missouri. Two local citizens arrived at the scene within minutes of the accident. Kenneth Foster was the first to arrive, followed by Gary Maasen. Trooper Bruce Baker ("Trooper Baker"), of the Missouri Highway Patrol, responded to the scene at approximately 3:33 pm. Upon arriving at the scene, Trooper Baker observed a Dodge pickup lying on its passenger side in a ditch on the right side of the road, and an Osage County ambulance. Driver admitted he had been driving the vehicle.

There is contradictory evidence regarding whether Trooper Baker asked Driver what and how much alcohol he had consumed. Trooper Baker testified that he asked Driver whether he had been drinking and that Driver said "yes." However, the alcohol influence report indicates that Driver said "No" when asked if he was under the influence of alcohol. During trial, Trooper Baker, in response to the question "Did he say how much he had been drinking?" testified "At that time, I didn't ask him how much, I don't believe."

Later, Driver's counsel asked Trooper Baker: "Prior to telling [Driver] he was under arrest at the scene, did you specifically ask him what he'd had to drink that day and when?" Trooper Baker replied: "I believe so. I misanswered earlier. Generally, when I ask someone, I don't ask them if they've been drinking. I ask them how much they've had to drink." Trooper Baker was then asked what Driver's answer was, and Trooper Baker replied that he did not recall what his answer was. Trooper Baker referenced the alcohol influence report form, and said Driver said he had three beers. However, the alcohol influence report form indicates that Driver was interviewed at the station *after* the arrest. Furthermore, the narrative written by Trooper Baker states "During processing, Mr. Paty insisted he had only drank [sic] three beers on an empty stomach ..." There is no indication in the narrative that Driver mentioned if or how much he had been drinking before he was arrested. The trial court concluded that Trooper Baker did not ask Driver what or how much he had to drink prior to arrest.

There was also controverted evidence regarding whether driver appeared to be intoxicated following the accident. Trooper Baker testified that he noticed a strong odor of intoxicants about Driver. Trooper Baker testified that he observed that Driver's speech was slurred and that Driver swayed as he walked. Driver presented the testimony of Kenneth Foster, who arrived at the accident scene within five minutes of the crash. Foster testified that Driver was not slurring his speech, did not smell of alcohol, and did not stumble or stagger. Driver also presented the testimony of Gary Maasen, who also arrived shortly after Driver's accident. Maasen testified that Driver was not slurring his speech and did not have trouble with his

1. RSMo.2000.

balance. Trooper Baker testified that he did not know if Driver was swaying back and forth or side to side and he did not know the degree to which Driver was swaying, although he was trained to make notes to that regard. Trooper Baker also testified that there was nothing unusual about the condition of Driver's eyes, in that they were not bloodshot, watery or glassy, and that his pupils were not dilated or contracted.

Driver also presented the testimony of Sam Gearhart who was working with Driver at the Marine Corps League the day of the crash. Gearhart testified that Driver consumed two beers while at the Marine Corps League, and that when Driver left, he was not slurring his speech or having any difficulty balancing. Driver testified himself that he was driving the truck and the crash was caused by the shifting of concrete blocks in the bed of his truck. He also stated that he was in the process of drinking an O'Doul's nonalcoholic beer when the crash occurred. Driver further testified that he had consumed three beers, that he had told Trooper Baker that he consumed three beers, and that he did not have any trouble with his speech or balance.

The trial court determined that Foster and Maasen were credible witnesses and that Driver did not slur his speech or have trouble with his balance. Furthermore, the trial court noted that Driver was evaluated by ambulance personnel on the scene, and there was no indication in the ambulance report to suggest that driver had any problems with balance or speech, nor were there indications that Driver's breath smelled of alcohol.

Trooper Baker administered the horizontal gaze nystagmus test, but he administered the test improperly and the results were not considered by the trial court. Trooper Baker then administered a pre- liminary breath test (PBT) using a portable breath testing device known as the Alco–Sensor III. Trooper Baker testified that he had been using the Alco–Sensor III since January 2001, and had used it around 100 times. Trooper Baker testified that he had come to rely on the PBT in making probable cause determinations and that he had found the PBT results to be consistent with subsequent breath or blood tests. The results of the PBT indicated that Driver's blood alcohol content was over the legal limit of .08%.

Trooper Baker did testify that he did not know how PBTs worked internally or whether the Alco–Sensor III was an infra- red or a fuel-cell device. Trooper Baker also stated that he did not hold a Type II permit that would authorize him to work on his PBT unit. He further testified that he had not completely read the operator's manual and that he had not personally performed any calibration checks on the PBT. There was no evidence presented by Director to establish that the device in question had ever been calibrated. Troop- er Baker testified that he couldn't say how many hours of training he actually had when he learned about the PBT in 1998, and that he could not say for sure which type of PBT instrument he had been trained on.

Trooper Baker admitted that he did not have Driver under his continuous observa- tion prior to giving him the PBT. When he returned to the patrol car and adminis- tered the PBT, he did not ask Driver when he had last consumed any beverages of any kind or when he had last smoked. The operator's manual for the PBT, admit- ted without objection, states that "A recent drink of an alcoholic beverage, a dose of medication containing alcohol or regurgita- tion could introduce 'mouth alcohol' to a breath sample thus causing an exaggerat- ed reading. A 15–20 minute deprivation

period prior to testing will insure 'mouth alcohol' has not influenced the breath alcohol reading." The manual also states that: "CAUTION: To assure a correct result, no alcohol should be consumed within 15 minutes of a test, and the subject should not be allowed to smoke." The operator's manual also indicates that if a positive reading is obtained, the operator is to wait 2 to 5 minutes and take a second test. Trooper Baker testified that the results of the PBT indicated that Driver's blood alcohol content was over the legal limit of .08%.

The trial court found that a reasonably prudent, cautious, trained police officer would not rely on the results of the PBT in this case. The trial court did not admit the PBT results into evidence. The trial court also concluded that even if the PBT test result had been admitted, the court "would otherwise give little or no weight to the PBT evidence because the lack of evidence of proper training, use and accuracy."

Driver was placed under arrest and transported to the Osage County Jail. At the jail, Driver was informed of his rights under the Missouri Implied Consent Law, and Trooper Baker asked for a sample of his breath. Driver then agreed to take the breath test, and his blood alcohol content ("BAC") was .095%.

At trial, Driver presented the testimony of a toxicologist, Dr. Terry Martinez. Dr. Martinez testified that based upon the amount Driver reported drinking and the times he reported drinking, that Driver's blood alcohol content was .044% with a 15 percent margin of error at the time of the accident, basing this conclusion upon a pharmacokinetic calculation which took various factors into account. Finally, Dr. Martinez testified that at .10% an individual is not obviously drunk. The court concluded that Trooper Baker did not have probable cause to arrest Driver. The trial court made no findings as to Driver's BAC.

In her first point, the Director maintains that the trial court erred in excluding the results of the preliminary breath test ("PBT"). The Director contends that the trial court erroneously declared and applied the law in requiring the officer to have reasonable suspicion prior to administering the PBT, in requiring due process protections prior to administration of a PBT and in holding that a reasonable officer would not rely on the results of a PBT under the circumstances of this case. In her second point, the Director claims that the trial court erred in finding that Trooper Baker did not have probable cause to arrest Driver. As her third point, the Director states that the trial court erred in failing to make a finding regarding Driver's blood alcohol content.

## Standard of Review

■■■■ An appellate court will affirm the trial court's judgment unless there is no substantial evidence to support it, it is contrary to the weight of the evidence, or if it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Where a trial court makes a specific finding that it did not believe the arresting officer's testimony in a driver's license case, the appellate court must defer to the trial court's prerogative to determine credibility. *Thurmond v. Dir. of Revenue*, 759 S.W.2d 898, 899 (Mo. App. E.D.1988). In addition, when assessing whether there is substantial evidence, we must defer to the trial court on factual issues. *Id.* Such deference is not limited to the issue of credibility of witnesses, but also to the conclusions of the trial court. *Hawk v. Dir. of Revenue*, 943 S.W.2d 18, 22 (Mo.App. S.D.1997). Appellate courts view the evidence in the light most favor-

able to the trial court's judgment. *Thurmond,* 759 S.W.2d at 899. On appeal, the judgment of the trial court is presumed to be correct and shall be affirmed under any reasonable theory supported by the evidence. *Jarrell v. Dir. of Revenue,* 41 S.W.3d 42, 46 (Mo.App.S.D.2001).

■ Finally, a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Vernon v. Dir. of Revenue,* 142 S.W.3d 905, 909 (Mo.App. S.D.2004). We will find an abuse of discretion only when the trial court's ruling is clearly against the logic of the circumstances, is so arbitrary and unreasonable as to shock the sense of justice, and shows a lack of careful consideration. *Id.* at 909. We must view the evidence in the light most favorable to the trial court's judgment. *Thurmond,* 759 S.W.2d at 899.

## Discussion

■ The statutory scheme for suspended or revoked driver's license cases requires the Director to initially present evidence to establish 1) probable cause for arrest, and 2) that the driver was driving with a blood alcohol level of .08% or greater. *Verdoorn v. Dir. of Revenue,* 119 S.W.3d 543, 545 (Mo. banc 2003). "Probable cause exists when the facts and circumstances warrant a person of reasonable caution to believe that an offense has been or is being committed, based on the circumstances as they appear to a prudent, cautious and trained police officer." *Walker v. Dir. of Revenue,* 137 S.W.3d 444, 446 (Mo. banc 2004). The trial court must assess the facts by viewing the situation as it would have appeared to a prudent, cautious and trained police officer. *Brown v. Dir. of Revenue,* 85 S.W.3d 1, 4 (Mo. banc 2002).

In this case, Driver did admit that he had been driving the truck at the time of the accident, and this evidence was uncon-

troverted. However, after hearing contradictory testimony regarding Driver's intoxication, the trial court found in Driver's favor on all evidence presented. The court determined that Driver's speech was not slurred, he did not have difficulty with his balance, his eyes were not bloodshot, glassy or watery, his breath did not smell of alcohol, and no indicators of intoxication were present.

■ The Director contends that even absent that evidence, Trooper Baker still had probable cause to arrest Driver because Driver's admission of consuming three beers was sufficient alone to support a finding of probable cause. In support of this claim, the Director cites *Soest v. Dir. of Revenue,* wherein there was uncontested evidence that the driver admitted that she had one beer, several hours earlier. 62 S.W.3d 619, 621 (Mo.App.E.D.2001). This court held that the driver's "admission justified the officer in offering [the driver] the chance for an accurate measuring of her alcohol level so that it could be compared to the statutory standard." *Id.*

The Director contends the testimony regarding Driver's admission to having three beers is un-contradicted. This is not so. Trooper Baker was questioned twice about whether he had asked Driver if he had consumed alcohol and his answers were inconsistent. The first time Trooper Baker was questioned, he stated that he did not ask how much Driver had been drinking. The second time, Trooper Baker stated that he had previously answered incorrectly and that he had asked how much Driver had consumed. He could not recall Driver's answer, but his memory was refreshed with the Alcohol Influence Report, which indicated that Driver answered that he had consumed three beers. However, this is noted in the "interview" section of the Report, and the Report indicates that the interview occurred *after* Driver was

arrested.[2] The narrative also indicates that "during processing," after Driver was arrested, Driver stated that he had consumed three beers. Thus, there was substantial evidence from which the trial court could determine that Trooper Baker did not ask how much or if Driver had been drinking until *after* he arrested Driver. Accordingly, Trooper Baker could not have used that information when calculating probable cause.

Because the trial court also disbelieved Trooper Baker's testimony that Driver had slurred speech, a wobbling gait, had watery, glassy, bloodshot eyes and smelled of intoxicants, the only evidence from which an argument could be made that Trooper Baker had probable cause to arrest Driver is the result of the PBT test administered pursuant to Section 577.021.[3] The trial court determined that the PBT test is a field sobriety test and that the results were unreliable in this case. In its order, the court cites *Brown*, in which the trial court disregarded evidence of improperly administered field sobriety tests when making its determination of probable cause. *See Brown*, 85 S.W.3d 1.

In *Brown*, the trial court, after hearing evidence regarding the proper administration of three field sobriety tests, determined that the Officer had improperly administered all three field sobriety tests and that a reasonably prudent, trained, or cautious police officer would not have relied on the tests in determining probable cause. *Id.* at 3. The trial court found that the officer did not have probable cause when he arrested Brown, and reinstated Brown's license. *Id.* The Supreme Court found that other evidence, such as the officer's observations of Brown swaying and an odor of intoxicants about him, supported a determination that the officer had probable cause to arrest Brown. *Id.* at 7. However, the Court also found that the trial court properly disregarded the improperly administered field sobriety tests. *Id.* at 4.

Under *Brown*, a court can disregard the results of an improperly administered field sobriety test. Because the reliability of field sobriety tests is a factual issue, we must give deference to the determinations made by the trial court. *See Hawk*, 943 S.W.2d at 22. In this case, the trial judge found that Trooper Baker did not receive any training in the use of the device in question and that he did not properly administer the test. Trooper Baker did not know the make and model of the unit at the time he used it. Trooper Baker did not know generally how the device worked internally. In addition, he had not completely read the manual. He did not observe Driver for 15–20 minutes before administration of the test to make sure he did not do anything that would affect the

---

2. The Report indicates that Driver was advised of his *Miranda* rights at 3:50 PM, and the interview in which Driver admitted to having three beers started at 4:18 PM. The narrative written by Trooper Baker indicates that he arrested Driver at the same time he read him his *Miranda* rights, and thus Driver was already arrested when Trooper Baker started the interview.

3. Section 577.021 states:
"Any state, county or municipal law enforcement officer who has the power of arrest for violations of section 577.010 or 577.012 and who is certified pursuant to chapter 590, RSMo, may, prior to arrest, administer a chemical test to any person suspected of operating a motor vehicle in violation of section 577.010 or 577.012. A test administered pursuant to this section shall be admissible as evidence of probable cause to arrest and as exculpatory evidence, but shall not be admissible as evidence of blood alcohol content. The provisions of section 577.020 shall not apply to a test administered prior to arrest pursuant to this section."
Mo.Rev.Stat. Section 577.021 (2004).

accuracy of the test. Trooper Baker did not know when Driver had last consumed any beverages or smoked prior to administering the test and did not observe Driver to see if he regurgitated or put anything into his mouth. Furthermore, the court determined that the device had probably not been checked for accuracy since January of 2001 when it was acquired, although the manual recommended that the device be checked for accuracy on a monthly basis.

There was substantial evidence from which the trial court could determine that the results of the PBT test should have been disregarded. There was no uncontradicted evidence of Driver's intoxication, and the trial court found the facts in favor of Driver. Thus, Trooper Baker did not have had probable cause to arrest Driver.

This court is primarily concerned with the trial court reaching the correct result as opposed to the route taken by the trial court to reach that result. *Bus. Men's Assurance Co. of Am. v. Graham,* 984 S.W.2d 501, 506 (Mo. banc 1999). Therefore, we will affirm the judgment under any tenable theory regardless of whether the trial court advances wrong or insufficient reasons. *Id.* Because the issue of probable cause is determinative of the case, and the trial court ultimately reached the correct result, we will not reach the remainder of the Director's points. Judgment affirmed.

CLIFFORD H. AHRENS, P.J., and GLENN A. NORTON, J., concur.