**STATE of Missouri, Appellant,**

v.

**Lindsey D. ROBERTSON, Respondent.**

**No. WD 72529.**

Missouri Court of Appeals,
Western District.

Dec. 14, 2010.

---

Brent M. Nelson, Columbia, MO, for Appellant.

Jerome S. Antel, III, Columbia, MO, for Respondent.

Before KAREN KING MITCHELL, P.J., JAMES EDWARD WELSH, and MARK D. PFEIFFER, JJ.

JAMES EDWARD WELSH, Judge.

The State of Missouri appeals the circuit court's order granting Lindsey D. Robertson's motion to suppress evidence concerning the results of a pre-arrest portable

breathalyzer test. The circuit court found that the evidence did not establish that the portable breathalyzer machine had been calibrated prior to Robertson's arrest and, therefore, no probable cause existed for her arrest. Pursuant to section 547.200.1(3), RSMo 2000, the State filed this interlocutory appeal. The State contends that the results of a portable breathalyzer test administered prior to arrest are admissible as evidence of probable cause and that the totality of the circumstances in this case establish probable cause to arrest Robertson for driving while intoxicated. We disagree and affirm the circuit court's order granting Robertson's motion to suppress.

The State charged Robertson with the class B misdemeanor of driving while intoxicated and the class B misdemeanor of operating a motor vehicle in a careless and imprudent manner. Robertson filed a motion to suppress, and the circuit court held a hearing. The evidence at the hearing established that, in the early morning hours of May 2, 2009, Missouri State Highway Patrolman Patrick Sublette was in his patrol car and was parked in a driveway accessing Route E in Boone County. At approximately 1:30 a.m., Sublette noticed a maroon, Toyota Tacoma pickup truck traveling northbound on Route E in an area with a posted speed limit of 40 miles per hour. When Sublette's radar gun indicated that the truck was traveling at a speed of 53 miles per hour, Sublette pursued the truck to initiate a traffic stop. Although Sublette temporarily lost sight of the truck, a short time later, he saw the truck enter Route E from Rose Drive, and Sublette initiated a traffic stop at approximately 1:36 a.m.

After stopping the truck, Sublette walked up to the side of truck. The driver of the vehicle provided Sublette with a driving license identifying herself as Lindsey Robertson. Sublette saw four people within the vehicle and noticed a strong odor of intoxicants coming from the vehicle's interior. Upon Sublette's request, Robertson exited her vehicle to join Sublette in his patrol car. Sublette continued to notice a strong odor of intoxicants upon Robertson's person. Sublette asked Robertson about her whereabouts and whether she had consumed alcohol prior to driving. Robertson explained that she was coming from The Field House in Columbia and that she had consumed about a beer-and-a-half. Robertson initially denied turning off of Route E after passing Sublette's patrol car, but, later, she admitted that she had in fact had turned off Route E because a passenger notified her that he was going to vomit. Sublette then left his patrol car to identify the intoxicated passengers in the truck. When he left his patrol car, Sublette allowed Robertson to remain in the patrol car to telephone her father on her cellular telephone about whether to perform field sobriety tests. Upon returning to his car, Sublette asked Robertson if she would submit to field sobriety tests including a preliminary breathalyzer test, and Robertson agreed.

When the State asked Sublette at the suppression hearing what he observed when he administered the portable breathalyzer test, Robertson's attorney objected based upon a lack of foundation for the test. The circuit court initially sustained the objection. The State then questioned Sublette further about the portable breathalyzer test machine:

Q. Trooper Sublette, are you familiar with the PBT [ (portable breathalyzer test) ] that you carry?

A. Yes.

Q. And is it one that's assigned specifically to you?

A. Yes.

Q. Have you operated it throughout your capacity as a highway patrolman?

A. Yes, I have.

Q. Are you aware of how often it's calibrated and who might calibrate it?

A. Yes.

Q. Okay. Who calibrates it?

A. Down at the radio shop at Troop F Headquarters—

[ROBERTSON'S ATTORNEY]: Well, Judge, I'm going to object. This is hearsay, obviously, if somebody else is going to be—

THE COURT: Objection will be sustained.

[ASSISTANT PROSECUTING ATTORNEY]: The question is whether he's aware that it's calibrated, your Honor.

THE COURT: And I think he was testifying to hearsay. Lay your foundation if it's not.

BY [ASSISTANT PROSECUTING ATTORNEY]:

Q. It is calibrated at Troop F Headquarters?

A. When I have my PBT calibrated, I take it to the radio shop and I—one of the radio operators does it while I stand there and watch them. They have a wet bath solution. I watch them hook up the PBT to the wet bath, blow into it, and observe the reading. It's a—

[ROBERTSON'S ATTORNEY]: I'll—

A. —.10 solution, and it's always—

[ROBERTSON'S ATTORNEY]: Judge, I'm going to object again to the lack of foundation for this. It's beyond the—

THE COURT: Objection will be overruled.

BY [ASSISTANT PROSECUTING ATTORNEY]:

Q. How often do you take that down there to have it calibrated?

A. We don't have a set policy on how often it has to be taken down. Looking at my maintenance records on it, it appears that I take it down about every two months or so.

Q. All right. Now, you've had opportunities to utilize this portable or preliminary breath test in your experience. Is that right?

A. Yes.

Q. And do you compare the results that you would read on the preliminary test with the Data Master or any other type of breathalyzer at the locations you would use those, whether it be the sheriff's department or other departments?

A. I don't keep a specific logging comparing one-to-one. However, it is my experience that the reading on the preliminary breath test is generally consistent—

[ROBERTSON'S ATTORNEY]: Well, Judge, I'm going to object. This is, again, lack of foundation for the reading on the portable breath test, plus definitely lack of foundation on the evidentiary breath test. He's just generally talking about—He's talking about other tests and we don't know what he's talking about.

THE COURT: Objection will be overruled.

BY [ASSISTANT PROSECUTING ATTORNEY]:

Q. Okay. You found them to be consistent with each other?

A. They are—I have never found an inconsistency in them. They are generally consistent. If I were to ever find an inconsistency, then I would ask that the unit be replaced or recalibrated or checked out. In the three years I've had it, I've never had a problem with it.

Q. And on May 2nd of 2009, did you have any reason to believe that your preliminary breath test in your vehicle was improperly maintained or inaccurate?

A. No.

Q. When Ms. Robertson provided a breath sample for the PBT, what did you observe?

Robertson's attorney then objected again for lack of foundation, and the circuit court overruled the objection. Robertson's attorney asked to *voir dire* the witness and engaged in this inquiry with Sublette:

Q. Trooper, you do not know and do not understand the scientific process by which this instrument takes a sample of breath and determines the blood-alcohol content; correct? That's outside your expertise. Is that right?

A. That's fair, yes.

Q. So you don't know that this instrument uses science that's generally accepted by the scientific community. Is that correct? You don't know how it works?

A. I know that I operate the—the PBT that I have has an automatic mode and a manual mode. I operate it in the automatic mode. And according to the manual, it says that if they provide an adequate breath sample, the instrument observes the curve and length of the breath and takes a reading.

Q. But the science behind it, you don't under—you don't know what the science even is?

A. I don't have a science degree with regard to the PBT.

Q. All right. So you don't know that that thing is based upon science that's generally accepted in the community or among scientists, do you?

A. I don't know the foundation behind that.

Robertson's attorney then renewed his objection regarding the portable breathalyzer test for lack of foundation, and the circuit court overruled the objection. On cross-examination, Sublette said that he did not know when the portable breathalyzer machine was calibrated prior to May 2, 2009, which was the date of the arrest in this case. Sublette said that "[i]t wasn't until July of 2009 that [he] started taking it to the radio shop to have it calibrated."

In regard to the portable breathalyzer test, Sublette testified that, at 2:03 a.m., he gave Robertson the breathalyzer test using the Lifeloc Portable Breath Test machine. Prior to administering the portable breathalyzer test, Sublette asked Robertson if she had anything in her mouth. While the portable breathalyzer machine was in automatic mode, Sublette collected a breath sample which showed a reading that was in excess of 0.08 percent.

Sublette then asked Robertson to perform other field sobriety tests, such as counting and reciting portions of the alphabet, as well as balance and walking tests. Robertson was able to do the counting and alphabet tests. On the one-leg stand test and the walk-and-turn test, Sublette noticed no standard clues of impairment.

During his contact with Robertson, Sublette said that he noticed that Robertson's eyes were watery, bloodshot, and glassy. Sublette also categorized Robertson's attitude as argumentative. When he asked Robertson where she would rate herself on a scale if one equals "being completely sober" and ten equals "being falling-down drunk," Robertson indicated that she was a "two."

Just prior to her arrest at 2:23 a.m., Robertson provided a second breath sample into the portable breathalyzer machine. Sublette observed a result well in excess of

0.08 percent. Prior to this breath sample, Sublette had continuously observed Robertson for fifteen minutes. Sublette then placed Robertson under arrest for the offense of driving while intoxicated. At the suppression hearing, the video recording of the stop, which included the interactions between Sublette and Robertson and the field sobriety tests, was received into evidence.

After the suppression hearing, the circuit court issued an order granting Robertson's motion to suppress. The circuit court found that, because no record existed establishing that the portable breathalyzer machine had been calibrated prior to Robertson's arrest, no probable cause existed for the arrest. The State appeals that ruling *via* an interlocutory appeal pursuant to section 547.200.1(3), RSMo 2000, which allows the State through the prosecuting attorney to appeal "from any order or judgment the substantive effect of which results in .... [s]uppressing evidence."

In its sole point on appeal, the State contends that the circuit court erred in granting Robertson's motion to suppress because the results of the portable breathalyzer test, which was administered prior to Robertson's arrest, were admissible as evidence of probable cause[1] and the totality of the circumstances in this case establish probable cause to arrest Robertson for driving while intoxicated. We disagree.

■ Our review of the circuit court's sustaining a motion to suppress is limited to determining whether or not substantial evidence supported the ruling. *State v. Peery,* 303 S.W.3d 150, 153 (Mo.App.2010). We consider all the evidence and reasonable inferences in the light most favorable to the circuit court's ruling and defer to the circuit court's factual findings and credibility determinations. *Id.*; *State v. Sund,* 215 S.W.3d 719, 723 (Mo. banc 2007). We will reverse a circuit court's ruling on a motion to suppress only if the decision is clearly erroneous and leaves us with a definite and firm impression that a mistake has been made. *State v. Dixon,* 218 S.W.3d 14, 18 (Mo.App.2007). However, although we review the circuit court's conclusions as to the historical facts under a clearly erroneous standard, the issue of whether or not the Fourth Amendment has been violated is an issue of law that we review *de novo. Peery,* 303 S.W.3d at 153.

■ The State contends that the circuit court erred in concluding that the results of the portable breathalyzer test had to be suppressed because no record existed establishing that the portable breathalyzer machine had been calibrated prior to Robertson's arrest. The State asserts that the results of the portable breathalyzer test could be considered for determining probable cause, regardless of evidence of calibration.

■ Section 577.021.1, RSMo Cum. Supp.2009, expressly permits an officer to administer a portable breathalyzer test prior to the arrest of a person suspected of driving while intoxicated. That section says:

Any state, county or municipal law enforcement officer who has the power of arrest for violations of section 577.010 or 577.012 and who is certified pursuant to chapter 590, RSMo, may, prior to arrest, administer a chemical test to any person suspected of operating a motor vehicle in violation of section 577.010 or 577.012.

---

1. For clarity, the results of the portable breath test were admitted by the circuit court at the suppression hearing.

§ 577.021.1. That section further provides that "[a] test administered pursuant to this section shall be admissible as evidence of probable cause to arrest and as exculpatory evidence, but shall not be admissible as evidence of blood alcohol content." § 577.021.3. The use of the portable breathalyzer test, therefore, is "strictly limited by statute." *State v. Duncan,* 27 S.W.3d 486, 488 (Mo.App.2000). It is used to indicate "the presence of alcohol based on a breath sample" and "is designed for use by police officers to assist them in determining whether they have probable cause to arrest a suspect." *Id.*

■ As such, the portable breathalyzer test "is not subject to the same Department of Health Regulations that govern breath analysis tests admissible to prove that a defendant was intoxicated. *See* Mo. Code Regs. title 19, §§ 25–30.011–25–30.060." *Id.* Indeed, section 577.021.3 specifically says, "The provisions of sections 577.019 and 577.020 shall not apply to a test administered prior to arrest pursuant to this section." Subsection 3 and 4 of section 577.020, RSMo Cum.Supp.2009, instructs that chemical tests of a person's breath, blood, saliva, or urine to determine a person's blood alcohol content must be performed according to methods and standards approved by the Department of Health. Pursuant to section 577.021, these methods and standards are not applicable to a portable breathalyzer test administered prior to a person's arrest. Moreover, the requirements for the validity of chemical tests contained in section 577.026, RSMo 2000, do not apply to the administration of a portable breathalyzer test. *State v. Stottlemyre,* 35 S.W.3d 854, 860 (Mo.App.2001). We, therefore, agree with the State that proof of calibration of the portable breathalyzer machine was not required for admissibility of the results of the portable breath test under section 577.021.

■ Admissibility of the results of the portable breath test, however, is not the issue because the circuit court clearly admitted the results into evidence for the purpose of the hearing on the motion to suppress. The State's real complaint is that the circuit court did not accept and rely on the results of the portable breath test. Viewing the evidence in the light most favorable to the circuit court's findings and ignoring any evidence to the contrary, as we must do in this case, it appears that the circuit court found the results of the portable breath test inconsistent with all the other evidence in the case. The circuit court received into evidence a video recording of the stop that included the interactions between Robertson and the trooper and included the field sobriety testing. Even the trooper conceded that, but for the results of the portable breath test, he probably would not have had probable cause to arrest Robertson for driving while intoxicated. Thus, to establish probable cause, the State was willing to rely solely on the results of the portable breath test. The circuit court, however, was not so willing given that it had reservations about the calibration history of the portable breath machine.

■ Indeed, the Missouri Supreme Court has recognized in a driving license revocation case that the lack of calibration of a portable breathalyzer machine may impact the circuit court's finding as to whether the results obtained from the portable breathalyzer test were credible.[2] *York v. Dir. of Revenue,* 186 S.W.3d 267, 272 (Mo. banc 2006), *overruled on other*

2. This is a criminal case, and, therefore, the test for admission of scientific evidence is the test established in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). In a civil matter, such as *York,* our courts follow the test set forth in section 490.065, RSMo 2000. However, even if the foundational requirements for admission of scientific evidence are met, it is still a

*grounds by White v. Dir. of Revenue,* 321 S.W.3d 298 (Mo. banc 2010). In *York,* the circuit court had found that the officer lacked the proper training to administer the portable breathalyzer test and that "no evidence existed to establish that the device used was properly calibrated, maintained or even working at the time it was used." *Id.* The Supreme Court deferred to the circuit court's credibility determinations and found that the circuit court acted within its discretion when it ruled that the portable breathalyzer test evidence was not credible. *Id.*

Further, in *Paty v. Director of Revenue,* 168 S.W.3d 625, 632 (Mo.App.2005), this court's Eastern District found in a driving license revocation case that a circuit court could disregard the results of a portable breathalyzer test as unreliable. The *Paty* court deferred to the circuit court's factual findings that the portable breathalyzer machine had probably never been calibrated and that the officer did not know how the machine worked internally, had not received any training in the use of the machine, and did not properly administer the test. *Id.* at 631–32.

The trooper in this case testified that he did not know when the portable breathalyzer machine was calibrated prior to May 2, 2009, which was the date of arrest in this case. The trooper said that "[i]t wasn't until July of 2009 that [he] started taking it to the radio shop to have it calibrated." Moreover, the trooper testified that he did not know how the portable breathalyzer machine worked, in that he did not understand the scientific process by which the machine took a sample of breath and then determined the blood-alcohol content. In

finding that no record existed establishing that the portable breathalyzer machine had been calibrated prior to Robertson's arrest, we infer that the circuit court questioned the reliability of the portable breathalyzer test and concluded that the portable breathalyzer test was not credible. We, therefore, defer to the circuit court's determination on the credibility of the portable breathalyzer test evidence. *Sund,* 215 S.W.3d at 723.

■ Without the portable breathalyzer test results, the trooper in this case did not have probable cause to arrest Robertson. Indeed, the trooper testified that, although Robertson smelled of intoxicants and had watery, bloodshot, and glassy eyes, he probably would not have arrested Robertson without the results from the portable breathalyzer test. Robertson performed several sobriety tests without any difficulty. She counted and recited the portions of the alphabet that the trooper asked her to do, and she completed the one-leg stand test and the walk-and-turn test without any standard clues of impairment. Although Robertson was stopped for speeding, speeding is not a sign of intoxication. After reviewing and taking into account the credibility of all the evidence, the circuit court exercised its discretion and sustained the motion to suppress. We find that the circuit court did not clearly err in granting Robertson's motion to suppress the evidence concerning the portable breathalyzer test. We affirm.

All concur.

---

discretionary decision for the circuit court to admit or deny the admission of the proffered evidence. *Scott v. Blue Springs Ford Sales, Inc.,* 215 S.W.3d 145, 173 (Mo.App.2006). While relevant to the issues in a motion to suppress, the use of the portable breath test to

establish probable cause for the arrest may not be relevant to the issues before a jury in a criminal trial. This is especially true when the indicium of reliability of the probable breath test is called into question, as was done in this case.