# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3055
_____

Simon Mahanna; Debra Ann Mahanna

*Plaintiffs - Appellants*

v.

U.S. Bank National Association

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: April 11, 2013
Filed: April 4, 2014
_____

Before COLLOTON, MELLOY, and SHEPHERD, Circuit Judges.
_____

MELLOY, Circuit Judge.

In the late 1980's Plaintiffs Simon Mahanna and Debra Ann Mahanna, husband and wife, gave physical possession of gold coins and proof sets to a predecessor of Defendant U.S. Bank, N.A. ("U.S. Bank"), as collateral to secure a line of credit. In 1997, in the midst of bank mergers and branch closings, Mr. Mahanna personally inquired as to the location of the gold coins. A bank representative informed him that

the bank could not locate the coins but was investigating the matter. Mr. Mahanna continued to inquire about the collateral for twelve years and was repeatedly told bank personnel were looking into the matter. In 2009, U.S. Bank stated conclusively that it no longer possessed the coins. In January 2011, the Mahannas filed the present action alleging breach of contract, negligence, and conversion.

The district court[1] granted summary judgment in favor of U.S. Bank, holding that the claims were time barred. The court determined that, at some point after Mr. Mahanna's initial inquiry but prior to 2001, a reasonable person would have known that an injury and substantial damages may have occurred. The district court found this notice sufficient to trigger commencement of a ten-year statutory limitations period which ended prior to the filing of this action. We affirm.

I.      Background

Simon Mahanna is a registered professional engineer who worked a variety of jobs including work as a city engineer, a planning engineer on power plant projects, and eventually the owner of his own development company. He later became a director of Boatman's Bank. Through Boatman's Bank, he met a banker who later went to work for Mark Twain Bank, Dennis Geohegan. Mr. Geohegan successfully solicited some of the Mahannas' business for Mark Twain Bank.

In September 1986, the Mahannas opened a six-month, $8,000 line of credit with Mark Twain bank and provided the gold coins and proof sets to the bank as physical collateral. Then, on May 1, 1987, the Mahannas executed an account agreement and a security and pledge agreement with Mark Twain Bank to set up an open-ended $8,000 secured line of credit. The note associated with the 1986 line of

---

[1] The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

credit is stamped "Paid by Execuline 8100064599 5-1-87." It appears that the 1987 line of credit replaced the 1986 line of credit because "Execuline 8100064599" is the account number listed on the note for the 1987 line of credit. The security and pledge agreement executed in 1987 listed as collateral the gold coins and proof sets. Mr. Mahanna now states that he was told Mark Twain Bank would hold the collateral in a safe deposit box at a specific branch of Mark Twain Bank, the Progress branch. The 1987 security and pledge agreement provided that Mark Twain Bank was to exercise reasonable care in the "custody and preservation" of the collateral and provided that Mark Twain Bank could demand additional collateral if at any time it believed itself to be undersecured.[2]

According to the Mahannas, an original purpose for the line of credit was to provide overdraft protection for a related checking account and to provide a convenient means for safekeeping the coins. In 1990, the Mahannas expanded their line of credit to $80,000 and provided as security three certificates of deposit. The certificates of deposit had face values totaling $72,000 and maturity dates of December 12, 1998. The Mahannas assert that the expanded line of credit was secured not only by the certificates of deposit, but also by the previously listed gold coins and proof sets. The documentation for the 1990 line of credit, however, contains only Mrs. Mahanna's signature and lists as security only the certificates of deposit. The 1990 documents do not list the gold coins, nor is Mr. Mahanna's name on the documents. Further, the documentation provided to this court is not sufficiently legible to ascertain from the face of the documents whether the security interest in the gold coins survived the 1990 execution of the line of credit. Plaintiffs assert and claim in deposition testimony that the security interest continued after that date, and Defendants admit in their court filings that they possess no evidence to

---

[2]A poorly reproduced copy of the 1987 security and pledge agreement is provided in the record. The document's extremely small typeface has not been well preserved through apparently repeated copying, and it is largely unreadable.

refute that assertion. The account number on the documents executed in 1990 is different than the account number on the documents executed in 1986 and 1987. In addition, the record contains a 1990 assignment of the $72,000 certificates of deposit signed by Mrs. Mahanna in favor of Mark Twain Bank.

The 1987 account agreement signed by Mr. and Mrs. Mahanna, and the 1990 account agreement signed only by Mrs. Mahanna, state, "I hereby grant you a continuing security interest in and right to set off at any time against any account I have with you, any collateral (except residential real estate) securing other loans with you and any other of my property (except residential real estate) now or hereafter in your possession, all as security for sums I owe you hereunder or otherwise, including . . . ." The 1987 account agreement then lists: "Various Gold Medals and Proof Sets[.]" The 1990 account agreement does not list these items. Rather it lists: "Security and Pledge Agreement dated January 18, 1990; Continuing Contract of Guaranty dated January 18, 1990[.]"

In 1997 a series of bank mergers and branch closings began through which Mark Twain Bank merged with or became owned first by Mercantile Bank, then by Firstar Bank, and, eventually, by U.S. Bank.[3] In 1997, the Mahannas received notice that the Progress branch would close. At that time, Mr. Mahanna spoke to a banker named Rich Ross in Mark Twain Bank's "Private Banking Group." Mr. Mahanna inquired as to the status of the gold coins, and Mr. Ross responded that he could not locate the coins and needed to investigate the matter. Mr. Mahanna claims to have followed up and sought additional information until 2002 or 2003, at which time Mr. Ross retired. When asked how frequently he made inquiries between 1997 and 2003, Mr. Mahanna stated, "A number. If you said once a month, that might have been on

---

[3] At this stage of the proceedings no party contests the Mahannas' assertion that U.S. Bank is a proper defendant as the ultimate successor to Mark Twain Bank.

-4-

the light side, just trying to follow-up. What I understood from [Rich Ross] was his biggest problem was getting other people to respond."

After Mr. Ross retired, Mr. Mahanna asked a bank representative named Sheridan Clark about the coins. According to Mr. Mahanna, he made inquiries less frequently "because it was hard getting ahold of" Mr. Clark. Mr. Mahanna continued to make inquiries, albeit less frequently, in subsequent years.

Then, in a 2009 letter, a bank representative admitted unequivocally that the bank did not have the collateral. The Mahannas' attorney sent a demand letter in 2010, and the bank confirmed that it did not possess the collateral. On Jan. 14, 2011, the Mahannas filed suit.

U.S. Bank moved for summary judgment asserting a statute of limitations defense. The district court applied a ten-year statute of limitations and found the Mahannas' claims time-barred. The court held that Missouri uses an objective "capable of ascertainment" test for determining the time of claim accrual. The court determined that at some point after 1997 but prior to January 2001, Mr. Mahanna had received sufficient notice in the form of repeated inconclusive responses to his inquiries about the coins to place him on notice that an injury and substantial damages may have occurred. Because the Mahannas filed their complaint more than ten years after receiving such notice, the district court found the claims time-barred.

The Mahannas filed a Rule 59 motion for reconsideration which the district court denied. The Rule 59 motion was an attempt to relitigate the issues raised in the summary judgment motion, and we do not address it separately.

II.   Discussion

A.   Standard of Review and Undisputed Facts

We review the grant of summary judgment based upon the statute of limitations de novo and take all facts in the light most favorable to the Mahannas. See Brown v. CRST Malone, Inc., 739 F.3d 384, 387 (8th Cir. 2014). This case provides many good examples of why states employ statutes of limitations. U.S. Bank is the third successor in interest to the bank that allegedly received the collateral from the Mahannas, and many of the individuals that Mr. Mahanna dealt with over the years have long since retired or moved on to other employment. No one, apparently, has sought information from Mr. Geohegan (who appears to be the person responsible for the Mahannas' interaction with U.S. Bank's predecessors and who presumably is the person who received the coins). Many documents that might provide a complete picture of the history of this matter purportedly are not retained by U.S. Bank under a seemingly unobjectionable document retention policy. And, several documents actually provided to the court appear illegible or barely legible. Further, the Mahannas have not placed account statements or other documents in the record to illustrate the history of their line of credit—amounts borrowed, outstanding balances at different times, and periods when the account balance may have been zero.

Missouri law applies in this case, and pursuant to Missouri law, U.S. Bank bears the burden of proving the applicability of the statute of limitations as an affirmative defense. Clayton Ctr. Assocs. v. W.R. Grace & Co., 861 S.W.2d 686, 690 (Mo. Ct. App. 1993); see also Brown, 739 F.3d at 387 ("'[I]t has long been the rule that the burden of establishing the statute of limitations defense lies with the party who asserts it.'" (quoting Nuspl v. Mo. Med. Ins. Co., 842 S.W.2d 920, 923 (Mo. Ct. App. 1992)). Among the Mahanna's several claims are claims for breach of a written

contract. The applicable statute of limitations for such a claim is ten years.[4] Missouri defines by statute when a claim accrues:

> Civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of sections 516.100 to 516.370, *the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment,* and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

Mo. Ann. Stat. § 516.100 (emphasis added).

"Missouri courts read the word 'ascertain' in § 516.100 as 'referring to the fact of damage, rather than the precise amount.'" O'Reilly v. Dock, 929 S.W.2d 297, 301 (Mo. Ct. App. 1996) (quoting M&D Enters., Inc. v. Wolff, 923 S.W.2d 389, 394 (Mo. Ct. App. 1996)). "When the *fact of damage* becomes capable of ascertainment, the statute of limitations is put in motion." M&D Enters., 923 S.W.2d at 394. The question of when damages are capable of ascertainment is an objective inquiry for the court to determine: the statute of limitations begins to run when "the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury." Bus. Men's Assurance Co. of Am. v. Graham, 984 S.W.2d 501, 507 (Mo.

---

[4] Although a shorter limitations period likely applies to the other claims in this case, the parties have focused exclusively on the ten-year period. Further, no party has identified any material facts that would cause our analysis to differ if we were to consider a five-year limitations period as contrasted with a ten-year period. The fighting issue in this case is commencement of the statutory period. If we accept Defendant's arguments, then the claim will be deemed to have accrued more than ten-years prior to filing suit. If we accept the Plaintiffs' arguments, then the claim will *not* be deemed to have accrued more than five years prior to filing suit.

Banc 1999) ("BMA").  In Powel v. Chaminade Coll. Prep., Inc., the Missouri Supreme Court reiterated this rule, stating "notice of sufficient information to alert plaintiff of the need to make inquiry was the trigger for the running of the statute of limitations."  197 S.W.3d 576, 583 (Mo. Banc. 2006).  Alternatively, the Missouri Supreme Court described the moment of claim accrual as the time "when a reasonable person would have been put on notice that an injury and substantial damages *may have occurred* and would have undertaken to ascertain the extent of the damages." Id. at 584 (emphasis added).

Here, the Mahannas filed suit on January 14, 2011.  Their suit is time barred if the cause of action accrued more than 10 years prior to that date.  It is undisputed that Mr. Mahanna knew as early as 1997 that the bank was having difficulty locating his valuable collateral.  According to U.S. Bank, this fact, in combination with Mr. Mahanna's repeated fruitless inquiries for more than three years were such that a reasonable person would have known "that an injury and substantial damages *may have occurred*," Powel, 197 S.W.3d 576 at 584 (emphasis added), at some point prior to January 14, 2001. U.S. Bank emphasizes the fact that, not only was there objective "notice of sufficient information to alert [Mr. Mahanna] of the need to make inquiry," id. at 583, but that he in fact did make such inquiries.  U.S. Bank asserts that this quantity and type of notice, all received prior to January 2001, "was the trigger for the running of the statute of limitations."  Id.  The Mahannas, on the other hand, argue that claim accrual did not occur until the bank confirmed it no longer possessed the coins in its response to the attorney's 2010 demand letter.

We discuss below the Missouri accrual statute and several informative cases that aid in our understanding of how to apply its objective standard.

B.      Missouri Cases Applying the "Capable of Ascertainment" Standard of Mo. Rev. Stat. § 560.100

The objective nature of the capable of ascertainment test, and the similarity of the notice in this case to the types of notice Missouri courts have found adequate to trigger claim accrual, show that, absent the arguably unique aspects of the possessory security relationship, this would be a simple case: Mahanna's claims clearly would be time barred.

In O'Reilly, 929 S.W.2d at 301–02, the Missouri Court of Appeals held that damages were "capable of ascertainment" and that a claim had accrued when a homeowner first had notice of a construction defect even though the homeowner pursued self-help and took remedial measures for years prior to filing suit. The homeowner argued that because he did not fully diagnose and fully identify the true cause of the defect until many years later, the claim did not accrue until that later time. Id. The court held that the original notice of defect was sufficient for claim accrual because it provided notice of some determinable damage and the likely existence of a cause of action. Id.

As in O'Reilly, the Mahannas had notice that their collateral could not be found, they took the self-help approach by making inquiries for years, but ultimately did not file suit until much later—after receiving actual confirmation of the object of their inquiry. Just like the Missouri Court of Appeals in O'Reilly did not demand certainty and complete and accurate identification of the construction defect in order to trigger commencement of the statutory limitations period, we cannot demand confirmation of the Mahannas' injury by U.S. Bank. To hold that the later-received confirmation was necessary for claim accrual would be to ignore the objective nature of the capable-of-ascertainment test and to treat the test as a subjective, confirmation-of-injury test.

In another construction-defect case, BMA, 984 S.W.2d at 507, the Missouri Supreme Court demonstrated how context matters for assessing whether a given set of facts would be sufficient to put a reasonable person on notice of a claim. In BMA, over four thousand marble panels were installed on the exterior of a building during its construction between 1961 and 1963. Id. at 502–03. The panels were installed in a manner that concealed their points of connection with and anchoring to the building's frame. Id. at 503. Three panels fell in 1985, and an investigation revealed allegedly negligent design and installation. Id. Evidence showed that minor problems with panels had occurred in the 1960s and 1970s, and at a bench trial, the court determined that these earlier problems were not of a sufficiently serious or similar nature to put the building owner on notice of a need to investigate further into a potentially larger defect issue. Id. at 508. The Missouri Supreme Court affirmed. BMA, therefore illustrates that a practical approach is required when assessing, under an objective standard, what the effect of an event or information may be upon the issue of claim accrual. Notice of a need to investigate triggers claim accrual but not every potential source of suspicion or insecurity gives rise to a duty to investigate.

Applying the lesson of BMA to the present case, we conclude that the cumulative inferences from several unsatisfactory bank responses to Mr. Mahanna's repeated requests over the course of three years demonstrates the objective notice required to trigger claim accrual. Just as the earlier, apparently non-alarming problems with panels in BMA did not trigger claim accrual, we do not hold that the bank's first vague response to Mr. Mahanna's first inquiry, standing alone, necessarily provided the required notice. Rather, Mr. Mahanna described his inquiries as being more frequent than monthly for a period of years. The absence of adequate responses by the bank after several such repeated inquiries sufficed to let a reasonable person know an injury and substantial damages may have occurred. This triggered claim accrual; and lest this rule seem harsh, we reiterate that, from that point in time, the Mahannas still had ten years to commence their action.

-10-

And in <u>Powel</u>, 197 S.W.3d at 580–844, the Missouri Supreme Court conducted an exhaustive review of claim accrual in Missouri in order to apply § 516.100 in the context of sexual abuse claims accompanied by allegations of long-term repressed memory and later-in-time damages in the form of post-traumatic-stress disorder. While the facts of <u>Powel</u> bear little resemblance to the present case, the Missouri Supreme Court was clear that an objective rather than a subjective standard applies: the test is a capable of ascertainment test and not a discovery test. <u>Id.</u> at 584. Further, the court repeatedly emphasized that a practical approach is needed when looking at the facts of any given case to determine if a reasonable person would have been put on "inquiry notice." <u>Id.</u> at 583. The receipt of information sufficient to cause a reasonable person to inquire further as to the existence of a wrong or the existence or extent of damages triggers the statute of limitations.

More recently, in <u>Gaydos v. Imhoff</u>, 245 S.W.3d 303, 307 (Mo. Ct. App. 2008), the Missouri Court of Appeals addressed a case with important factual similarities to the present case. In <u>Gaydos</u>, the board president for a cemetery held sole control over the cemetery's funds. <u>Id.</u> at 305. He allegedly had stolen from the cemetery between 1997 and 2000, and when the cemetery filed an action against him in 2005, he raised a five-year statute of limitations as a defense. <u>Id.</u> The Missouri Court of Appeals explained that the record contained no information that might have put the board on notice of possible embezzlement until a specific date in 2000. <u>Id.</u> at 307. At that time, the board president could not answer questions from the board about funds from a particular fundraising project that he was to have deposited in the cemetery's accounts. <u>Id.</u> The court concluded unequivocally that the board president's inability to answer simple questions about the funds provided the board with objective, inquiry-level notice. The court stated, "The actionable wrong was not 'capable of ascertainment' until December 10, 2000, *when Imhoff's vague responses gave the Cemetery board notice of a potential financial problem.* Prior to that time, at least one board member had a suspicion of inappropriate activity but no specific facts to indicate the possibility of a financial loss." <u>Gaydos</u>, 245 S.W.3d at 307 (emphasis

added). The repeated claims to be investigating the locations of the Mahanna's coins were akin to these "vague responses" and cumulatively provided sufficient notice to trigger the statute of limitations at some point in the three years of inquiries that followed Mr. Mahanna's initial inquiry.

Similarly in Ball v. Friese Constr. Co., 348 S.W.3d 172, 174 (Mo. Ct. App. 2011), a property owner became aware of some damage and a likely construction or earthwork defect in December 2001. The property owner employed two different engineering firms for tests and reports over the course of the next two years, but did not file suit until December 2009 after receiving a report in 2009 from a third engineering firm. Id. at 174–75. The claims at issue were subject to a five-year statute of limitations. The Missouri Court of Appeals held that the initial, December 2001 notice of a defect sufficed to trigger the statute of limitations and that the claims were untimely. Id. at 177–78. The Missouri Court of Appeals stated:

> Although Appellant continued to experience problems with the home, he waited until 2009, approximately seven years, before having another study completed to further ascertain the cause of the defect. The damages evident in 2001, coupled with the reports in 2001 and 2002, would have put a reasonably prudent person on notice of a potentially actionable injury; thus the statute of limitations began to run at that time.

Id. at 177.

The Mahannas discovered in 1997 that the bank could not locate their collateral. For a few years, the plaintiffs made inquiries about the collateral, but waited twelve years to vigorously press the issue resulting in the bank's 2009 and 2010 statements that it no longer had the collateral. Like the earlier notice in Ball, and in O'Reilly, the 1997–2001 notice in the present case "would have put a reasonably prudent person on notice of a potentially actionable injury; thus the statute of limitations began to run at that time." Id.

-12-

The Mahannas appear to argue that these cases collectively establish only that the Missouri courts have rejected a "full discovery of the extent and cause of *damages*" rule, but that the Missouri courts still require that a plaintiff have actual knowledge that an injury has occurred before a claim will accrue. According to the Mahannas their claim did not accrue until 2009 when the bank representative confirmed that the bank no longer possessed the coins. They characterize receipt of the bank's confirmation as the first moment that they actually knew they had been injured. In essence, the Mahannas try to restrict the applicability of Missouri's objective notice-based claim-accrual standard only to the scope of damages and not to the fact of injury.

We reject this distinction. The cases cited above all involved varying degrees of certainty regarding not only the scope of damages, but also varying degrees of certainty for the prospective plaintiffs regarding the underlying fact of an injury. In Gaydos, for example the court found sufficient notice of an injury and damages when the cemetery board president could provide only vague responses to financial inquiries. Gaydos, 245 S.W.3d at 307. At that point in time, it was by no means *known* to the board that damages had occurred. What mattered for claim accrual purposes was the board's receipt of information sufficient to put the board on inquiry notice as to the fact of actionable injury. See also Powel, 197 S.W.3d at 583 (describing the standard of inquiry notice as applying to "the wrong and damages"). The Mahanna's attempted distinction would restrict application of inquiry notice standard in a manner not supported by the Missouri cases.

Finally, the Mahannas appear to suggest that the status of the coins as collateral and the ongoing security relationship should affect our claim-accrual analysis. The Mahannas do not fully develop this argument, and they do not identify authority suggesting that, as a matter of law, the existence of the security relationship somehow supplants application of § 516.100. Rather, the Mahannas appear to argue that the absence or presence of a formal "demand" and the ongoing nature of the coins as

-13-

collateral are material facts bearing on the objective analysis of inquiry notice and precluding a grant of summary judgment.

We reject this argument because the collective impact of the bank's vague assurances and non-responses for several years is such an objectively clear warning of a potential injury and substantial damages that our court can only interpret it as providing claim-triggering inquiry notice. In Gaydos, 245 S.W.3d at 307, the Missouri Court of Appeals treated one vague response into a potential financial shenanigan as sufficient for claim accrual under § 516.100. Here, the parties' ongoing relationship as client and banker (rather than as board and board president as in Gaydos) arguably makes some period of reliance reasonable or explainable. It does not, however, make three years' reliance reasonable.[5]

---

[5]Although the parties did not specifically brief authority regarding the accrual of actions related to bailments, pledges, or possessory security interests, we have reviewed the issue of claim accrual in these settings and find nothing that changes our analysis. Rather, an "immediate" cause of action arises when a party in possession takes action inconsistent with the relationship, and an aggrieved party's failure to make a demand does not postpone claim accrual. Restatement (First) of Security § 71 (1941); 8A Am. Jur. 2d Bailments § 74 ("[T]he elements of demand and refusal are not required if other evidence establishes an act of conversion; that is to say, an act of dominion by the bailee over the property inconsistent with, or adverse to, the bailor's right to the property. The demand for return is also not required if making a demand would be futile or if the bailor's acts amount to a clear repudiation of the bailee's rights."). See also Lackawanna Chapter of the Ry & Locomotive Hist. Soc'y v. St. Louis County, Mo., 606 F.3d 886, 889–90 (8th Cir. 2010) (rejecting the argument that a formal demand was required for claim accrual and stating that when the bailee "took actions inconsistent with the bailment and in defiance of the bailor's rights, . . . the damage was sustained and capable of ascertainment"); Bollman Bros. Co. v. Peake, 69 S.W. 1058, 1059 (Mo. Ct. App. 1902) ("It is not the law that the accrual of a cause of action dependent on a demand . . . can be postponed indefinitely by the failure of a claimant to make demand.")

III.    Conclusion

The facts behind this case may be unfortunate.  Responsibility for the lost collateral may rest with the bank or with one of its current or former employees.  If so, the statute of limitations in this case may very well be protecting a negligent or even nefarious actor.  Responsibility for the lost collateral, however, may also rest with the Mahannas—the last documentation suggesting that the coins might still serve as collateral was executed in 1990.  The coins may well have been returned to and misplaced by the Mahannas long ago.  In any event, statutes of limitations exist to prevent the litigation of stale claims.  Baron v. Kurn, 164 S.W.2d 310, 317 (Mo. 1942) ("[S]tatutes of limitation rest upon reasons of sound public policy in that they tend to promote the peace and welfare of society, safeguard against fraud and oppression and compel the settlement of claims within a reasonable period after their origin and while the evidence remains fresh in the memory of the witnesses.").  Whether the Mahannas could or could not have continued to borrow on the allegedly ongoing line of credit does not change the fact that reasonable persons had to have known, prior to January 14, 2001, that their creditor's non-responsiveness and inability to locate the collateral suggested that an injury and substantial damages "may have occurred."

We affirm the judgment of the district court.[6]

_____

---

[6]We deny as moot the Mahannas' pending motion to supplement the record.

-15-