# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1906

_____

Lana Weinbach

*Plaintiff - Appellant*

v.

The Boeing Company; Computershare, Inc.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: June 15, 2021
Filed: July 29, 2021

_____

Before GRUENDER, ARNOLD, and STRAS, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Lana Weinbach sued The Boeing Company and Computershare, Inc., after, she claims, they wrongfully escheated her property to the state. When the defendants

moved for summary judgment on the ground that Weinbach brought her case too late, the district court[1] agreed and granted the motion. Weinbach appeals, and we affirm.

Weinbach and her father jointly owned Boeing stock, and Weinbach's father received annual tax statements, called 1099-DIVs, reflecting that dividends had been paid. In 2007 Computershare, which handled recordkeeping involving shareholders' stock ownership on behalf of Boeing, identified the account containing the shares as being dormant and set in motion a process that resulted in the shares being escheated to the State of Missouri the next year. Weinbach's father passed away a few months later, in January 2009, and that month, or the following one, Weinbach received a 1099-DIV that reflected the dividends issued in 2008. The amount of dividends reported in this 1099-DIV was much lower than in previous years and, contrary to recent history, much lower than the dividends reported on a different account containing Boeing shares that Weinbach and her father also jointly owned. The simple explanation is that dividends were reduced on the account at issue thanks to the escheat. This 1099-DIV also turned out to be the final one that would be sent for this account.

By the time of her father's death, stock dividends were Weinbach's primary, if not sole, source of income, and so she was no stranger to the role that annual 1099-DIVs served for tax-reporting purposes. She also had a Ph.D. in industrial psychology and had demonstrated her financial literacy by personally preparing her father's income tax returns after he died. When she filed her father's 2008 return, moreover, she reported the dividends reflected from the final 1099-DIV associated with the account. She also admitted that, at the time of her father's death, she knew the stocks that they had owned together.

---

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

Weinbach sued Boeing and Computershare in March 2018, asserting claims of negligence and conversion stemming from the escheat of the property. All agree that these claims are subject to a five-year limitations period. *See* Mo. Rev. Stat. § 516.120; *see also Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 764–65 (8th Cir. 2020) (Missouri conversion); *State ex rel. Heart of Am. Council v. McKenzie*, 484 S.W.3d 320, 324 (Mo. banc 2016) (negligence). The question is when these claims accrued, which triggers the running of the five-year limitations period.

Weinbach maintains that her claims accrued at the earliest on March 8, 2013, which would make her claims timely by a day. That was the day Weinbach says she learned of the escheat when, prompted by a television program, she contacted the Missouri State Treasurer's office to inquire if she had any unclaimed property. The district court disagreed and held that her claims had accrued sooner because her failure to receive 1099-DIVs in 2010, 2011, and 2012 for the account, along with the sharp decrease in reported dividends, would've alerted a reasonable person in her position to investigate a potential injury.

Missouri law provides that a claim does not accrue "when the wrong is done or the technical breach of . . . duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment." Mo. Rev. Stat. § 516.100. A claim does not accrue when a "plaintiff subjectively learn[s] of the wrongful conduct and that it caused his or her injury." *See Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 584 (Mo. banc 2006). The standard, rather, is an objective one that asks "when a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages." *Id.* Or, as stated elsewhere in *Powel*, "the statute of limitations begins to run when the evidence was such to place a reasonably prudent person on notice of a potentially actionable injury." *Id.* at 582.

We agree with the district court that Weinbach's claims accrued before March 2013, which makes them untimely. The defendants offer a few reasons this is so, including the drastic decrease in dividends that the final 1099-DIV revealed. But the reason we find persuasive is that Weinbach did nothing to inquire about the status of the account despite not receiving 1099-DIVs in 2010, 2011, or 2012. As we said, she acknowledged that she knew she owned the account with her father and that she received the final 1099-DIV for the account the month her father died, or shortly thereafter, and used it when preparing his 2008 income tax return. After her father's death, moreover, she became sole owner of the account and so would have had a personal financial motive to monitor the mail for 1099-DIVs. She also derived most or all her income from dividends, and she was familiar with how 1099-DIVs facilitate the completion of tax returns. Like the district court, we think a reasonable person in her shoes, after gathering her father's tax documents for 2008 and becoming sole owner of the relevant account, would have investigated why she didn't receive 1099-DIVs in 2010, 2011, or 2012. In short, she was "on notice to inquire further," *see id.* at 584, making the existence of a wrong and the scope of damages, if any, "capable of ascertainment." *See Mahanna v. U.S. Bank Nat'l Ass'n*, 747 F.3d 998, 1004 (8th Cir. 2014).

Weinbach quarrels with this reasoning, but her contentions are unpersuasive. She maintains that the absence of 1099-DIVs would not have led her to question the status of the account until 2013, which was after she had already learned of the escheat from the treasurer's office. That spring Weinbach prepared her father's final tax return—for tax year 2009—after obtaining a three-year extension. She argues that it was not until she tried to file his return that she would have realized that the absence of a 1099-DIV suggested that "there was something going on with the" account. But the absence of the 1099-DIVs during this three-year period would've spurred a reasonable person who owned the shares to inquire further at that time, not just when filing the return. She also would have been obligated to report any dividend income from the account on her own returns at some point.

In addition, Weinbach appears to be stumping for a discovery rule, if not in name then in substance. Her position appears to be that her claim was not capable of ascertainment until she actually learned of the escheat when she called the treasurer's office. But *Powel* specifically rejected a discovery rule. 197 S.W.3d at 584. What matters is evidence that makes the fact of damage discoverable, or, stated otherwise, "the existence of evidence that places a reasonable person on notice that an injury and substantial damages may have occurred and causes them to ascertain the extent of their damages." *See Aguilar v. Thompson Coburn LLP*, 540 S.W.3d 910, 915–16 (Mo. Ct. App. 2018). With this standard in mind, we think a reasonable person in Weinbach's shoes would have discovered that an escheat had occurred well before she says she actually discovered it.

In *Chemical Workers Basic Union, Local No. 1744 v. Arnold Savings Bank*, 411 S.W.2d 159, 160 (Mo. banc 1966), a case from which *Powel* drew extensively, a union president was alleged to have misappropriated dividend checks made payable to the union. The court held that the union's officers could have discovered the president's misappropriation within the limitations period with reasonable diligence because the officers knew "they could expect annual dividends[,] but they did nothing to find out when or what dividends were paid or who received the dividend checks." *Id.* at 165. So the claims were capable of ascertainment. The same is true here, where Weinbach knew to expect annual 1099-DIVs. Even though *Chemical Workers* involved the expectancy of actual dividend checks and not 1099-DIVs reflecting what would have been on the dividend checks, we think this is a distinction without a difference. The point is that reasonable people in either circumstance would investigate the status of the money they were due, even if that money was supposed to be reinvested (as Weinbach says she presumed) rather than going straight into their pockets.

Weinbach also asserts that the district court committed legal error by misapplying the governing standard. Her argument on this score is somewhat difficult

to follow, but she appears to fault the court for failing to state precisely when she was on notice that any injury she may have suffered was "potentially actionable." She seems to suggest that, even if she had notice of an injury, that doesn't mean that she was on notice that the injury was potentially actionable.

Even assuming that Weinbach's view of the governing standard and her interpretation of the court's order are correct (matters we need not decide), we simply see no reason to think that an injury stemming from a wrongful escheat could be anything but potentially actionable. That injury and its potential actionability go hand in hand, unlike the case on which Weinbach primarily relies. *See Burdess v. Cottrell, Inc.*, 359 F. Supp. 3d 704 (E.D. Mo. 2019). There, the plaintiff awoke early one morning with arm numbness but only later learned from his doctor that he had a medical condition, for which he blamed the defendant. In determining when the cause of action accrued, the court explained that someone who wakes up with arm numbness wouldn't know, without more, that the injury was the result of another's tortious conduct rather than ordinary aches and pains. A reasonable person at that point would not have necessarily thought that some person had caused his injury. *Id.* at 709–10. But that's not the situation Weinbach found herself in. The moment she should have discovered her injury was the same moment she should have realized that someone might be responsible for causing it. We therefore reject her contention.

Affirmed.

_____